**Joseph Pernell RUTH, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–03–01158–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

June 21, 2005.

---

3. Because of our disposition of appellant's first issue, we need not address her second issue. *See* TEX.R.APP. P. 47.1.

Douglas M. Durham, Houston, for appellants.

Eric Kugler, Houston, for appellees.

Panel consists of Justices YATES, EDELMAN, and GUZMAN.

## OPINION

LESLIE BROCK YATES, Justice.

Appellant, Joseph Pernell Ruth, appeals his conviction for the murder of Kenjenea Williams. In seven issues, appellant makes the following claims: the trial court erred in permitting his daughter to be cross-examined with a prior written statement, admission of his wife's hearsay statements violated his right of confrontation, the trial court erred in admitting appellant's statements to the police, and the evidence is factually insufficient to support the verdict. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Appellant is married to Clara Ruth, and they have four children together. Several years after they were married, appellant began a romantic relationship with the victim, Kenjenea Williams. Appellant and Williams eventually had two children together, and both of these children are the same ages as two of his children with Clara. Appellant and Clara lived in a house on Greencraig Street in Houston, Texas, and appellant rented a nearby apartment for Williams. Sometimes appellant lived on Greencraig with Clara, and sometimes he stayed with Williams. At times, Williams's children lived with appellant and Clara on Greencraig, and at other times, they lived with Williams in her apartment. Angelica Ruth, appellant and Clara's oldest daughter, considered Williams's children to be her brother and sister.

The living arrangements and relationship between appellant and these two women were complex and volatile. After Clara learned of the appellant's relationship with Williams, Clara, with appellant's help, tried to physically evict Williams from her apartment. At one point, appellant obtained a restraining order against Williams, which he then ignored to continue his relationship with her.

In early June 2002, Williams was arrested for cocaine possession, and appellant loaned her money to get out of jail. Appellant was very concerned that Williams repay this money, and he told Williams's cousin, "I promise you, man, if your cousin don't pay me back this money, y'all going to be missing a family member." On June 12, 2002 around 6:30 p.m., while Williams was at a car repair shop, appellant came

up behind Williams and grabbed her and said, "Where's my $4,000 b—— (expletive)." The car repair shop owner testified that appellant seemed very angry and that Williams seemed scared and appeared to be trying to calm appellant. After he found out that she had paid for her car repair, appellant grabbed Williams's hand and said, "Let's go." Williams was killed shortly thereafter.

According to a written statement by Angelica, who was nine years old at the time, she and her mother and siblings were at their home on Greencraig when appellant and Williams arrived. She heard appellant and Williams arguing and then saw Williams on her knees and appellant standing over Williams with a gun in his hand. Angelica heard Williams say, "Please, no, Joe." Appellant then said, "You going to take care of the kids?," and Williams responded, "Yes, I will." While Clara was gathering the children to take them out of the house, Angelica saw appellant and Williams, still arguing, go into the back yard. Clara, Angelica, and the rest of the children left. Angelica told the police she did not hear or see the shooting.

Clara and the children went to a house where several of Clara's relatives lived, including her cousin and mother. According to Clara's cousin, who testified at trial, Clara showed up scared, crying, and hyperventilating and asked to speak to her mother. When Clara's mother came outside, Clara said to her, "Joseph shot Kenjenea." Clara explained that appellant and Williams had been arguing and that she saw appellant shoot Williams nine times in the head and many more times in the body. Clara's mother called 911 for her, and Clara told the 911 operator, "I left my house and my husband's girlfriend whatever was in the house and ... they started arguing. He pulled out a gun so I left.... I don't know what's going to hap-

pen.... They're arguing. He has a gun.... They always have arguments."

Police responded and arrived at the house on Greencraig at about 7:26 p.m. They found Williams dead in the back yard with a total of fifteen gunshot wounds, nine of which were in the head and face. Soon, relatives of both appellant and Williams began to gather at the scene. Around 10:30 that evening, appellant approached a parked Houston Police Department patrol car and told the officer, Joel Garza, "Officer, I'm wanted. I just killed my wife, the mother of my kids. Please take me in." Officer Garza was at the end of his shift completing paperwork so he could go home, and he really did not want to deal with appellant. He asked appellant, "What?," and appellant stated, "Please, officer, hurry up. They're coming. Her relatives are coming to kill me. Please, hurry up, take me in." Officer Garza, who knew nothing about the murder, thought he was dealing with a "nut case," so he planned on dropping appellant off at the main police station. Garza opened the back of his police car, and appellant got inside. According to Garza, during the drive, appellant was very talkative and told him that he killed the mother of his children because he had taken money out of savings to post bail for her and "he had it" with her. Appellant also told Officer Garza that he had gotten a protective order against her and that he was "tired of her stupid mess." Officer Garza called homicide and learned of the murder. He then took appellant to the homicide division. Appellant denied that he told Officer Garza that he murdered anyone and claims that he wanted to be taken into custody solely for protection from Williams's relatives.

At trial, the jury found appellant guilty of murder, and appellant was sentenced to

ninety-nine years in prison. This appeal followed.

## ANALYSIS

### *Angelica's Written Statement*

■ On the night of the murder, Angelica accompanied an officer to the police station and made a statement, which the officer typed. Angelica's written statement provides in relevant part as follows:

Tonight I was at home doing the dishes when there was a knock at the door. My mom answered it. My dad and [Williams] were there. They both came inside.

I heard my dad and [Williams] begin to argue. They were in the hallway. I was still in the kitchen. My mom was at the doorway to the master bedroom. She called for me to come to her. As I walked past my dad and [Williams] I saw that [Williams] was on her knees and my dad was standing over her with a gun in his hand. I heard [Williams] say, "Please, no, Joe." I then heard my dad say, "You going to take care of the kids?" [Williams] said, "Yes, I will."

I went into the master bedroom. My mom went to gather the rest of the kids in the house. I peaked out the master bedroom window and saw that my dad and [Williams] had gone into the back yard. They were still arguing.

My mom came and got me. She, my three sisters, my brother and I all got in the van parked out front. Mom drove us away. I did not hear or see any shooting.

Based on the information in her statement, the State called Angelica as a witness during the guilt stage of the trial. Before she could testify, however, appellant's counsel requested a hearing, claiming Angelica was incompetent to testify and had no relevant testimony to give be-

cause she would testify that she could not remember the events on the night of the murder or giving a statement to the police. The prosecutor explained that Angelica and Clara had gotten their own attorney and since that attorney had prevented the prosecutor from speaking to Angelica, she did not know what Angelica's testimony would be. After the competency hearing, the trial court determined Angelica was competent to testify.

In the presence of the jury, Angelica testified about her family structure, including describing all of appellant's children with Clara and Williams and explaining where the children lived and who cared for them. Angelica said she knew that Williams was killed and thought it happened at the house on Greencraig, but she said she did not remember anything else about that evening. She examined the written statement and acknowledged that it was her signature on the statement, but she claimed she could not remember going to the police station or making the statement.

When the prosecutor attempted to impeach Angelica with her statement to the police, appellant made several objections, including hearsay and improper impeachment. His principal objection, both in the trial court and on appeal, is that the State could not call Angelica solely for the purpose of impeaching her with otherwise inadmissible evidence. The prosecutor responded that she called Angelica in good faith based on her written statement, that she was surprised by Angelica's memory failure, and that Angelica's testimony was needed to establish other important facts, such as the structure and operation of her family. The trial court overruled appellant's objection, finding that Angelica was not being called solely for impeachment purposes, and gave a limiting instruction that the jury should consider the state-

ment for impeachment purposes only. In his first two issues, appellant complains that the trial court erred in admitting Angelica's written statement to the police for impeachment purposes.

■ We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Long v. State,* 130 S.W.3d 419, 426 (Tex.App.-Houston [14th Dist.] 2004, no pet.). We must uphold the trial court's decision as long as it is within the zone of reasonable disagreement, giving almost total deference to a trial court's determination of historical facts that are supported by the record. *Wheeler v. State,* 67 S.W.3d 879, 888 (Tex.Crim.App.2002); *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App. 1997).

■ Texas Rule of Evidence 613(a), which concerns examining witnesses regarding a prior inconsistent statement, provides in relevant part:

> In examining a witness concerning a prior inconsistent statement made by the witness, whether oral or written, and before further cross-examination concerning, or extrinsic evidence of, such statement may be allowed, the witness must be told the contents of such statement and the time and place and the person to whom it was made, and must be afforded an opportunity to explain or deny such statement.... *If the witness unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted.*

TEX.R. EVID. 613(a) (emphasis added). If the admission is partial, qualified, or otherwise equivocal, or if the witness claims to not remember making the prior statement, the prior statement is admissible for im-

peachment purposes. *See McGary v. State,* 750 S.W.2d 782, 786 & n. 3 (Tex. Crim.App.1988); *Staley v. State,* 888 S.W.2d 45, 49–50 (Tex.App.-Tyler 1994, no pet.); *Miller v. State,* 666 S.W.2d 269, 274 (Tex.App.-Dallas 1984, pet. ref'd). Here, when questioned about the statement, Angelica did not unequivocally admit making it; rather, she claimed she could not remember.

■ Although Angelica's statement was admissible for impeachment purposes, appellant is correct that the State cannot call a witness for the primary purpose of impeachment and thus use impeachment as a subterfuge to present otherwise inadmissible evidence. *See Barley v. State,* 906 S.W.2d 27, 37 n. 11 (Tex.Crim.App. 1995); *Armstead v. State,* 977 S.W.2d 791, 795–96 (Tex.App.-Fort Worth 1998, pet. ref'd). However, the State must know in advance that the witness will recant. *See Barley,* 906 S.W.2d at 37 n. 11 (summarizing prior cases on the issue, noting that "in each of those cases, the witness had *already* recanted his or her statement in prior sworn testimony at a previous trial or hearing"); *Kelly v. State,* 60 S.W.3d 299, 302 (Tex.App.-Dallas 2001, no pet.) (finding no abuse of discretion in allowing State to impeach with prior statement when prosecutor suspected, but did not know for certain, that witness would recant). The prosecutor had not been able to speak with Angelica before calling her and had a good faith belief that Angelica would testify according to the statement she gave to the police. Though appellant's counsel told the court he suspected she did not recall giving the statement, the State is not required to accept defense counsel's representation at face value.[1] Further,

---

1. Appellant complains that the State did not voir dire Angelica to verify his representation. Appellant cites no authority that the State is

required to voir dire its own witness, and appellant does not argue on appeal that he

the trial court explicitly found that Angelica was not being called solely for impeachment purposes, and that finding is supported by the record. Thus, the trial court did not abuse its discretion in admitting the statement.

 Even if the trial court erred in admitting Angelica's statement, any such error is harmless in this case. The most damaging portion of Angelica's statement—that appellant was standing over Williams with a gun in his hand—was also admitted after appellant opened the door during his case-in-chief,[2] and appellant does not complain on appeal about the admission of that testimony. "[O]verruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling." *Leday v. State*, 983 S.W.2d 713, 718 (Tex.Crim.App. 1998).

We overrule appellant's first and second issues.

### Clara's Hearsay Statements

 As detailed above, when Clara arrived at her cousin's house, Clara told her mother that appellant and Williams had been arguing and that appellant had shot Williams multiple times in the head and body. Appellant objected to Clara's cousin's testimony regarding Clara's statements based on hearsay. The trial court overruled appellant's objection, concluding the statements were excited utterances under Texas Rule of Evidence 803(2), and appellant does not dispute on appeal that these statements were excited utterances. Clara's cousin then authenticated the tape of the 911 call, on which Clara tells the 911 operator that appellant and Williams were arguing and that appellant had a gun. Appellant objected to admission of the 911 tape on multiple grounds, including hearsay and violation of his right to confront witnesses under the state and federal constitutions.[3] The trial court overruled these objections as well and admitted the 911 tape.

 In his third and fourth issues, appellant complains that the trial court's admission of Clara's hearsay statements violated his right of confrontation.[4] At trial, however, appellant objected to Clara's statements to her mother only on the basis of hearsay. It is well established that a hearsay objection does not preserve a Confrontation Clause argument for appeal.[5] *See Wright v. State*, 28 S.W.3d 526,

was denied any opportunity to conduct his own voir dire examination.

2. During his case-in-chief, appellant called a detective to the stand and asked him, "Did Clara Ruth ever say in her statement that she saw Kenjenea Williams kneeling at Joseph Ruth's feet while he held a gun on her?," to which the detective answered in the negative. The State claimed that appellant had opened the door to Angelica's statement because he implied Clara had made an assertion that was contained only in Angelica's statement. The detective was then allowed to clarify that Angelica, not Clara, was the person who had made the assertion.

3. *See* U.S. CONST. amend. VI; TEX. CONST. art. 1, § 10. Where, as here, the parties have not argued that differences in state and federal constitutional guarantees are material to the case, and none is apparent, we limit our analysis to the United States Constitution and assume that its concerns are congruent with those of the Texas Constitution. *In re Commitment of Fisher*, 164 S.W.3d 637, 645, No. 04–0112, 2005 WL 1185511, at *6 (Tex. May 20, 2005).

4. Appellant is unclear in his briefing whether he is also complaining about the statements Clara made to her mother or only the 911 call, but we will liberally construe his argument to include both sets of statements.

5. Over twenty pages in the record later, when discussing his objections to the 911 tape, appellant's counsel attempted to clarify his ob-

536 (Tex.Crim.App.2000); *Saldivar v. State*, 980 S.W.2d 475, 496 (Tex.App.-Houston [14th Dist.] 1998, pet. ref'd). Thus, as to Clara's statements to her mother implicating appellant, any Confrontation Clause complaint is waived.[6] Accordingly, we address only whether the admission of the 911 tape violated appellant's constitutional right to confront witnesses.

In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court established a new framework for analyzing Confrontation Clause claims. If the statement at issue is "testimonial," it is inadmissible unless the declarant is unavailable and the accused has had a prior opportunity for cross-examination. *Id.* at 53–54, 124 S.Ct. 1354. Thus, the threshold issue under *Crawford* is whether the statement to be admitted is testimonial. *Spencer v. State*, 162 S.W.3d 877, 879 (Tex.App.-Houston [14th Dist.] 2005, no pet. h.). The *Crawford* Court did not define "testimonial," but it noted three formulations of "core" testimonial evidence: (1) "*ex parte* in-court testimony or its functional equivalent," such as affidavits, custodial examinations, prior testimony not subject to cross-examina-

tion, or "similar pretrial statements that declarants would reasonably expect to be used prosecutorially," (2) "extrajudicial statements" of the same nature "contained in formalized testimonial materials," and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 541 U.S. at 51–52, 124 S.Ct. 1354. The Court further explained that the term "testimonial" applies "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68, 124 S.Ct. 1354.

In *Spencer*, we reviewed the relevant authority from Texas and other jurisdictions in deriving several principles for use in determining whether a statement is testimonial:

(1) Testimonial statements are official and formal in nature.

(2) Interaction with the police initiated by a witness or the victim is less likely to result in testimonial statements than if initiated by the police.

(3) Spontaneous statements to the police are not testimonial.

---

jection to the prior testimony regarding Clara's statements to her mother, stating: "I hope the Court appreciates that when I stand up and say hearsay in the heat of a series of questions, I'm also complaining about my confrontation rights. And I didn't expressly state that when I made my objection, but I think in light of all the discussion we're having about Clara's and Angelica's statements, that was apparent." Appellant does not contend on appeal that this retroactive clarification preserved a confrontation objection to this testimony, and correctly so. Confrontation and hearsay are distinct objections, and an objection made after evidence has been admitted does not preserve error. *See Atl. Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414, 421 (Tex.App.-Houston [14th Dist.] 1991, writ denied) (noting that "[t]he party waives

any complaint if an objection is made after admission of the evidence" and finding appellant waived hearsay objection when he failed to include a hearsay objection with his other objections until the third time the evidence was admitted).

**6.** Even if a confrontation complaint regarding Clara's statements to her mother had been preserved, it is without merit because spontaneous statements to acquaintances do not implicate the right to confrontation. *See Woods v. State*, 152 S.W.3d 105, 114 (Tex.Crim.App. 2004) (finding "casual remarks that [the defendant] spontaneously made to acquaintances" to be nontestimonial), *cert. denied*, —— U.S. ——, 125 S.Ct. 2295, 161 L.Ed.2d 1092 (2005).

(4) Responses to preliminary questions by police at the scene of a crime while police are assessing and securing the scene are not testimonial. *Spencer,* 162 S.W.3d 877, at 881–83. Using these principles, we determined that statements to the police, whether spontaneous or in response to preliminary questions, when police are called to a crime scene shortly after a crime are not testimonial because such interactions are not initiated by the police and are not formal or structured. *Id.* at 882–83.

Though no Texas court has yet addressed this situation, statements made during 911 calls are similar in nature to the situation we addressed in *Spencer.* Such statements are not given in response to structured police questioning or with an eye to future legal proceedings but are initiated by a victim or witness to obtain police assistance. *See People v. Corella,* 122 Cal.App.4th 461, 18 Cal.Rptr.3d 770, 776 (Ct.App.2004); *People v. Moscat,* 3 Misc.3d 739, 777 N.Y.S.2d 875, 879–80 (Crim.Ct.2004); *State v. Davis,* 111 P.3d 844, 849 (Wash.2005). They usually do not bear any of the official, formal qualities of the police interactions the Confrontation Clause was intended to protect against. *See Corella,* 18 Cal.Rptr.3d at 776; *Moscat,* 777 N.Y.S.2d at 879–80; *Davis,* 111 P.3d at 850–51. Some courts have held that statements made during 911 calls should be analyzed on a case-by-case basis because some statements could be testimonial under certain circumstances. *See People v. West,* 355 Ill.App.3d 28, 291 Ill. Dec. 72, 823 N.E.2d 82, 91 (2005) (holding that 911 calls should be analyzed on a case-by-case basis to determine whether statements at issue were volunteered to obtain police action or the result of interrogation to gather evidence for use in a criminal prosecution); *People v. Mackey,* 5 Misc.3d 709, 785 N.Y.S.2d 870, 872 (Crim. Ct.2004) (noting that "[v]arious courts have

begun to adopt a fact-specific analysis of the particular call and the caller's motive for making the call" in conducting *Crawford* analyses); *Davis,* 111 P.3d at 850 ("In most cases, one who calls 911 for emergency help is not 'bearing witness,' whereas calls made to the police simply to report a crime may conceivably be considered testimonial. It is necessary to look at the circumstances of the 911 call in each case to determine whether the declarant knowingly provided the functional equivalent of testimony to a government agent."). *But see People v. Cortes,* 4 Misc.3d 575, 781 N.Y.S.2d 401, 415 (Sup.Ct.2004) (categorically concluding that "[c]alls to 911 to report a crime are testimonial under [*Crawford* ]").

■ We agree with those courts that have determined that it is necessary to look at the circumstances of each case to determine whether statements made in a 911 call are testimonial in nature. Here, however, appellant provides no analysis as to why Clara's statements to the 911 operator were testimonial, and we see nothing in the record suggesting that this call, in which a witness to a crime in progress at her home summoned the police, deviates from the typical, nontestimonial 911 call. We hold that Clara's statements to the 911 operator were not testimonial, and therefore the trial court's admission of testimony regarding these statements did not violate appellant's confrontation rights.

■ In any event, error, if any, in the admission of the 911 tape is harmless. Constitutional error is not reversible if we determine beyond a reasonable doubt that the error did not contribute to the conviction. Tex.R.App. P. 44.2(a); *see also Simpson v. State,* 119 S.W.3d 262, 269–71 (Tex.Crim.App.2003) (applying Rule 44.2(a) standard to a Confrontation Clause claim), *cert. denied,* —— U.S. ——, 124 S.Ct. 2837,

159 L.Ed.2d 270 (2004). Clara's statements to her mother that appellant shot Williams multiple times in the head and body are very specific and much more incriminating than the statements to the 911 operator that appellant and Williams were arguing and that he had a gun. In light of this evidence as well as the other evidence in the record, including appellant's own statements to the police, we conclude beyond a reasonable doubt that admission of the 911 tape did not contribute to appellant's conviction. *See Simpson,* 119 S.W.3d at 271 (finding Confrontation Clause violation to be harmless error where evidence of guilt was strong and erroneously admitted statement was corroborated by other evidence).

We overrule appellant's third and fourth issues.

### *Appellant's Statements to the Police*

■ In issues five and six, appellant claims the trial court erred in denying his motion to suppress his oral statements to Officer Garza that he killed Williams. At the suppression hearing, Officer Garza testified that appellant approached him while Officer Garza was in his patrol car and said that he had just "killed my wife, the mother of my kids" and asked to be taken in. Officer Garza asked "What?," and appellant again asked to be taken in. After appellant was in the back of Officer Garza's patrol car, he continued to repeat his prior statements and gave more detail, such as that he had just posted bail for the woman he killed and that he had "had it" with her. Officer Garza testified that during this time, the only questions he asked appellant were for his name and date of birth.

■ We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Mason v. State,* 116 S.W.3d 248, 256 (Tex.App.-Houston [14th Dist.]

2003, pet. ref'd). We give almost total deference to a trial court's findings of historical fact when those findings are supported by the record. *Guzman,* 955 S.W.2d at 89. When, as here, there are no written findings in the record, we view the evidence in the light most favorable to the trial court's ruling and uphold the ruling on any theory of law applicable to the case. *Mason,* 116 S.W.3d at 256.

■ The Fifth Amendment to the United States Constitution protects against custodial interrogation by the police without proper procedural safeguards. *See Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Similarly, Article 38.22 of the Texas Code of Criminal Procedure makes any statement made as a result of custodial interrogation inadmissible unless certain procedural steps are followed. Tex.Code Crim. Proc. Ann. art. 38.22, § 3(a) (Vernon 2005).

■ We need not determine whether appellant was in fact in custody when making his various statements to Officer Garza because we conclude that Officer Garza did not interrogate appellant. Under both the Fifth Amendment and Article 38.22, voluntary statements not made in response to police interrogation are admissible. *See Miranda,* 384 U.S. at 478, 86 S.Ct. 1602 ("Volunteered statements of any kind are not barred by the Fifth Amendment...."); *Stevens v. State,* 671 S.W.2d 517, 520 (Tex.Crim.App.1984) (finding appellant's statements to be admissible under Article 38.22 because "the statements were voluntary statements, made while in custody but not in response to interrogation"). Appellant's initial statement upon approaching Officer Garza that he "killed my wife, the mother of my kids" and requesting to be taken in was completely sponta-

neous and therefore not the product of interrogation. Likewise, when Officer Garza said "What?" and appellant repeated a portion of his prior voluntary statement, that was also not the product of interrogation. Further, general and routine questions do not constitute interrogation. *Daniels v. State*, 25 S.W.3d 893, 897 (Tex.App.-Houston [14th Dist.] 2000, no pet.). After appellant was in Officer Garza's patrol car, Officer Garza merely asked for appellant's name and date of birth. Such routine questions are not interrogation. *Jones v. State*, 795 S.W.2d 171, 173, 176 (Tex.Crim.App.1990) (questions by officer conducting a field sobriety test, including asking name and date of birth, were not interrogation); *Townsend v. State*, 813 S.W.2d 181, 186 (Tex.App.-Houston [14th Dist.] 1991, pet. ref'd) ("Inquiries by the custodial officer regarding a defendant's name, address, height, weight, place of employment, or physical disabilities are the type of questions normally attendant to arrest and custody and do not constitute interrogation under the fifth amendment."). We conclude that appellant's statements were not the product of interrogation, and thus, the trial court did not abuse its discretion in denying appellant's motion to suppress. We overrule appellant's fifth and sixth issues.

### Sufficiency of the Evidence

 In his seventh issue, appellant contends the evidence is factually insufficient to support his conviction because, without considering all of the evidence he challenges in his first six issues, the remaining evidence is "obviously so weak as to undermine confidence in the jury's determination and is greatly outweighed by the contrary proof." However, in conducting a factual sufficiency review, we consider all evidence admitted, even if later determined to be inadmissible. *See Rodriguez v. State*, 819 S.W.2d 871, 872–

73 (Tex.Crim.App.1991); *Pine v. State*, 889 S.W.2d 625, 630 n. 3 (Tex.App.-Houston [14th Dist.] 1994, pet. ref'd). Further, we have concluded that the trial court did not abuse its discretion in admitting all of the challenged evidence. That evidence is more than sufficient to support the jury's verdict. We overrule appellant's seventh issue.

Having overruled all of appellant's issues, we affirm the trial court's judgment.