# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00117-CR

**Jonathan Williams, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT
### NO. CR-05-280, HONORABLE WILLIAM HENRY, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

A jury convicted appellant Jonathan Williams of murder and sentenced him to fifty-five years' imprisonment. On appeal, he complains that the trial court should have granted his motion for a mistrial following the State's reference to evidence earlier ruled to be inadmissible and that his statements to a police officer should have been ruled inadmissible because he was clearly in custody at the time he made the statements. We affirm the trial court's judgment of conviction.

Appellant was charged with murdering Michell Webb, whom he had been dating for a number of years. Webb was reported missing by her family on November 17, 2003, after her father found her car in a Wal-Mart parking lot in Bexar County. A San Antonio police officer questioned appellant about Webb's disappearance, and appellant said he did not know where she was. The officer noticed a small abrasion under appellant's left eye, and appellant said his nephew had scratched him while they were wrestling. Although appellant did not raise the officer's suspicions

related to Webb's disappearance, he was arrested due to unrelated outstanding warrants and brought before a magistrate; he was still in police custody when he eventually led the police to Webb's body on November 20, 2003. On November 19, 2003, the police found Webb's keys and credit card in a closet at the car wash where appellant worked. That same day, while appellant was still in custody for the unrelated warrants, Detective Tim Angell interviewed appellant, telling appellant he was inquiring into Webb's disappearance and reading him his statutory rights. Appellant initially denied knowing anything about Webb's whereabouts, but after Angell said that the police were fingerprinting Webb's vehicle and had recovered a videotape from the Wal-Mart parking lot, appellant said that on November 16, 2003, Webb, whom he had been dating for four years, told him she "needed to get away." Appellant said that at Webb's request, he dropped her off at the airport at about midnight, left her vehicle in the parking lot, rode his bike home, and then lied to Webb's parents when they called looking for her. Angell typed appellant's statement as appellant spoke and asked appellant to read and sign the statement, which includes a portion setting out appellant's rights. Appellant initialed next to each of his statutory rights and signed the statement.

On November 20, 2003, Detective Barney Whitson interviewed appellant again about Webb's disappearance. During the course of the day, appellant gave three different statements, each of which was typed on a form that recited appellant's statutory rights, included a statement that appellant understood and waived his rights, and was read and signed by appellant. Before appellant gave his first statement, Whitson also read him his rights and had appellant initial a different form from which Whitson read appellant's rights. Appellant's first statement was similar to the story he told Angell, but when Whitson said he thought Webb had scratched appellant's face and suggested

2

that DNA evidence could incriminate appellant, appellant gave a second statement in which he said members of the Mexican Mafia to whom he owed money had taken Webb.

Whitson again told appellant that he did not believe his statement and informed him that the police had found blood inside Webb's car and "that not only did [appellant] have a scratch under his left eye, his right eye was also scratched and it looked like [Webb] was trying to gouge his eyes out." Appellant then gave a third statement admitting to killing Webb. Appellant said Webb was upset because he told her he "just wanted to be friends," so he and Webb drove around in her car, smoked marihuana, and argued. According to appellant's statement, Webb lunged at him and scratched his face, and he "held her against my chest to keep her from hitting me" and to calm her. Appellant held Webb until she stopped moving and then realized he had suffocated her. He unsuccessfully tried to resuscitate her and then drove her body to another location, where he stayed for about four hours, "drinking beer, smoking weed and holding Michell. I was apologizing to Michell." He said, "I don't want to say where I put Michell but I'm willing to show you where she is." Appellant eventually guided Whitson to Webb's body in a field in Hays County.

In his first issue, appellant argues that the trial court should have granted his motion for mistrial after the State referred during closing arguments in the guilt/innocence phase to toxicology tests performed on Webb's body. We disagree.

Dr. Kimberley Molina, medical examiner for Bexar County, testified that Webb was strangled, although on cross-examination, she admitted that there might have been a "combination" of strangulation and smothering, as described by appellant. The State asked Molina about the results of toxicology tests performed on Webb, but defense counsel objected that the answer would be

3

hearsay because Molina did not personally conduct the tests. The trial court sustained the objection, and the State said, "My only concern is they've left a false impression with the jury because the defendant is saying she took drugs with him and I'm sure that they're going to get up and argue that she was doing this and that and saying bad things about her . . . ." Later in the State's questioning, Molina testified that alcohol or another depressant might slow a victim's respiration such that "it would take less effort" to smother or strangle her. The State asked whether drugs or alcohol were found in Webb's system, appellant objected again, and the trial court sustained the objection.

In the State's initial closing statement, the prosecutor did not refer to whether Webb had used marihuana. In his closing, appellant's counsel argued that it was more likely that the Mexican Mafia had killed Webb or, alternatively, that appellant killed her accidentally. He said, "The medical examiner also said that if you had a combination of say alcohol and barbiturates and someone starts strangling you, it would take a lot less pressure to cause the injury." He then said, "What if you're taking ecstasy and marijuana and whisky and Ice House or whatever else that these young people were doing, whatever else they were doing—they had been together a long time, they know each other." He went on to say that the Webb family was "blessed" because two of their three children "went on and became productive citizens, but Michell was a little wild." Still later he said, "He's a young black man, he's dating a white girl, they may be doing some kind of drugs together, alcohol together." On rebuttal, the prosecutor attempted to counter defense counsel's arguments and then said, "And there's been no evidence admitted to you that there was any drugs in Michell's system. As a matter of fact, when I asked Kim Molina about the toxicology, who objected and kept it out? [Defense counsel]. Don't you know that if there is anything that helped his case, he would

4

have let that in." Defense counsel objected, and the trial court sustained the objection. Counsel asked for an instruction to disregard, which the trial court granted, and then asked for a mistrial, which the court denied.

We review a trial court's refusal to grant a mistrial for an abuse of discretion, and mistrial is required "[o]nly in extreme circumstances, where the prejudice is incurable." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). "A mistrial is the trial court's remedy for improper conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Id.* (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). In our review, we consider three factors: "(1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction)." *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

Initially, we note that the prosecutor's statement might be viewed as invited by defense counsel's repeated statements that Webb had been drinking and using drugs, both in general and on the night she was killed. *See Nethery v. State*, 692 S.W.2d 686, 703 (Tex. Crim. App. 1985) (four proper areas of jury argument are summation of evidence, reasonable deductions from evidence, answer to defense arguments, and plea for law enforcement); *see also Long v. State*, 823 S.W.2d 259, 269 (Tex. Crim. App. 1991) (prosecutor's statement that defendant could have provided jury with mitigating evidence was invited by defense counsel's statement, "I don't know what his mental state was in 1983 in Bay City, Texas. I wasn't there and we weren't there . . . .").

Even if we assume that the prosecutor's statement that there was no evidence related to toxicology results was not invited, we hold that any error was cured by the trial court's instruction to the jury to disregard. *See Bower v. State*, 769 S.W.2d 887, 907 (Tex. Crim. App. 1989) ("Ordinarily, any injury from improper jury argument is obviated when the court instructs the jury to disregard, unless the remark is so inflammatory that its prejudicial effect cannot reasonably be removed by such an admonishment."). When we consider the brevity of the prosecutor's remark, the trial court's sustaining of appellant's objection and instruction to disregard, and the overwhelming weight of the evidence of appellant's guilt—such as appellant's untrue statements, his eventual confession, his knowledge of the location of Webb's body, and the medical examiner's testimony that Webb was strangled and probably not smothered—we hold that the trial court did not err in denying appellant's motion for mistrial. *See Mosley*, 983 S.W.2d at 259. We overrule appellant's first issue.

In his second issue, appellant argues that the trial court should not have allowed testimony during the guilt/innocence phase by San Antonio Police Officer Daryl Volkmann about a statement appellant made after Webb's body was discovered. Appellant argues that "[a]t the time that the victim's body was found, the Appellant was under the impression that he was under arrest for the traffic warrants" and that "[a]t no time was the Appellant told that he was under arrest for the murder of [Michell] Webb." We disagree.

After appellant gave his third statement, Whitson, appellant, and two other detectives drove out to find Webb. After her body was located, Volkmann and his partner were asked to drive appellant back to San Antonio. Volkmann testified that when they arrived back at the police station, appellant asked without any prompting "how much time did I think he would receive for the murder

6

of [Webb]. He stated, 'After all, I confessed to killing her.'" Volkmann had not himself read appellant his rights or informed him that he was under arrest for Webb's murder before appellant made the statement.

Although there was no testimony of when appellant was explicitly told that he was under arrest for Webb's murder, he was told at least four times that he was being questioned with regard to her disappearance; was read his rights at least twice; signed one form reciting his rights to indicate that he understood his rights; signed one form that also recited his rights, initialing next to each right; and read and signed his three written statements, all of which recited his rights and stated that he understood and waived his rights. Before he gave his first statement to Whitson, Whitson informed appellant that he was being questioned with regard to Webb's disappearance, and before his second and third statements, he was also informed about the state of the evidence discovered thus far. Appellant eventually gave a statement admitting to killing Webb and led the police to her body. Not until appellant had been driven back to the police station in San Antonio in handcuffs and leg irons did he make the statement about which he complains. It is beyond rational belief that appellant might have still been under the impression that he was only in custody for outstanding warrants or might somehow not have realized that the focus of the officers' interest in him had shifted from outstanding warrants to Webb's murder. Further, Volkmann testified that appellant volunteered the question without any prompting or questioning, and therefore it was not the result of custodial interrogation. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 5 (West 2005) (nothing precludes admission of statement "that does not stem from custodial interrogation, or of a voluntary statement"); *Ruth v. State*, 167 S.W.3d 560, 570-71 (Tex. App.—Houston [14th Dist.] 2005,

7

pet. ref'd) (volunteered statement made to police officer without prompting by police interrogation was admissible).  We overrule appellant's second issue.

Having overruled both of appellant's issues, we affirm the trial court's judgment of conviction.

_____

David Puryear, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed:   June 18, 2009

Do Not Publish

8