**Opinion issued June 6, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00440-CR

———————————

**MICHAEL EUGENE LEWIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 228th District Court**
**Harris County, Texas**
**Trial Court Case No. 1742369**

## MEMORANDUM OPINION

The trial court found appellant Michael Eugene Lewis guilty of the offense of

aggravated kidnapping[1] and assessed his punishment at confinement for 20 years.

The trial court also entered an affirmative finding that Lewis used or exhibited a

---

[1]   *See* TEX. PENAL CODE § 20.04(b).

deadly weapon, namely, a knife, during the commission of the offense. In two issues, Lewis contends that his trial counsel was ineffective during the guilt/innocence phase of trial and that the judgment should be reformed to reflect his actual jail-time credit.

We affirm.

## Background

In August 2017, Lewis, his wife P.H., and their three children were living with P.H.'s mother (complainant R.M. ("Mother")) and seventeen-year-old sister (complainant D.M. ("Sister")).[2] Lewis's two minor sons by a prior relationship, E.L. and O.L., were also living in the house.

P.H. testified that Lewis had a history of losing his temper and physically assaulting her. She noted that he kept "guns and knives" and had used them to threaten her on several occasions during their marriage. On August 13, 2017, Lewis "strangled [her] and used a bedsheet to wrap around [her] face" in front of their children. That night, P.H. and the children left and went to a domestic-violence shelter.

---

[2] In accordance with our common practice, and as did the State in its brief, we protect the identities of the children involved in this case by referring to them, and to their family members, by initials or pseudonyms. *See Bays v. State*, 396 S.W.3d 580, 582 n.2 (Tex. Crim. App. 2013); *Jenkins v. State*, No. 01-18-00987-CR, 2020 WL 1679697, at *1 n.3 (Tex. App.—Houston [1st Dist.] Apr. 7, 2020, pet. ref'd) (mem. op., not designated for publication).

2

Mother testified that she did not know why P.H. had left or where she had gone. Eight days later, Sister accompanied Mother to her housekeeping job at a hotel. When they got home after work, around 1:00 a.m., Lewis was in the driveway waiting for them. E.L. and O.L. were waiting for them in the house as well.

Mother testified that Lewis directed her and Sister to give him their cellular phones. They complied and Lewis turned them off. Lewis, who was holding a knife, asked where P.H. had gone. When Mother replied that she did not know, Lewis "pulled [Mother] by her hair and took [her] down to the ground." Lewis placed his hands around Mother's neck and choked her. When Mother awoke, her head was wrapped in tape and her hands and feet were bound. She heard Lewis tell one of his sons to shoot her if she moved.

Mother was carried outside to Lewis's truck, and Sister, who was also bound, was placed on top of her. Mother felt the truck start, and it was moving for a "very long" time. When it stopped, Sister was removed. Lewis then "dragg[ed]" Mother out and along the ground. Mother heard sounds that she identified as weapons being loaded. Mother then felt Lewis place the cold blade of a knife against her neck, and she thought that he was going to "slit [her] throat."

Instead, Lewis said something inaudible and cut the tape from Mother and Sister. Lewis put them back into the truck and drove back to the house. During the drive, Lewis threw the duct tape that had bound Mother and Sister into the street.

3

And Lewis told Mother and Sister not to tell anyone what had happened, because he had "friends who were in a cartel."

When they arrived back at the house, Lewis directed Mother and Sister to give him their clothes so that he could wash them. Mother testified that she and Sister stayed in Mother's room because they did not feel free to leave.

Early the next morning, Mother awakened Sister and the two of them quietly left the house and drove to a police station. Mother was then taken by ambulance to a hospital. The trial court admitted into evidence Mother's medical records and photographs of the wounds she suffered to her neck, chest, elbow, and wrists.

Sister testified that on the night of the kidnapping, Lewis "pulled [Mother] by her hair" and "pulled both of us to the floor." He put his hands around Mother's neck and strangled her, until she "turned purple" and "went unconscious." Sister further testified that Lewis told E.L. and O.L. to bind Mother's and Sister's ankles and wrists with duct tape, and they complied. They taped Sister's hands behind her and put tape over her mouth. Sister noted that either E.L. or O.L. had a gun. Lewis opened the garage and carried Mother to his truck. He placed her on the backseat floorboard and placed Sister on top of her.

Sister also testified that Lewis drove them to a forest, where he "pulled [Mother and Sister] out of the truck onto the grass." Sister testified that Lewis had a "hunting knife" and that she saw him "pull" Mother's hair up and "put [the] knife

4

on her neck." Sister thought that Lewis going to kill Mother. Instead, he cut the tape off of Mother and Sister and told them that they were going home and that "none of that happened." During the drive, Lewis told Mother and Sister not to tell anyone or go to the police because "he has people who can find [them] and kill [them]."

Sister additionally testified that, once back at home, she and Mother stayed in Mother's bedroom. Lewis came in and demanded their clothes and ordered them to shower. Early the next morning, Mother and Sister left the house barefooted to avoid waking Lewis or his sons.

E.L. testified under an immunity agreement with the State. E.L. testified that at the time of the events, he was 13 years old. He further testified that when P.H. left, Lewis was "outraged." Before Mother and Sister got home from work on the night of the kidnapping, Lewis told E.L. and O.L. "exactly what we were going to do that night."

According to E.L., everything "happened exactly as [Lewis] planned." E.L and O.L had duct tape and, at Lewis's direction, they "taped [Mother's and Sister's] hands first and then their mouths, then their legs and sat them down." As they were doing that, Lewis was "[s]tanding there with a gun." E.L. further testified that during the kidnapping two firearms were used—an AR-15 and a Glock. Lewis also brandished an "all-black hunting knife" with paracord wrapped around the handle.

5

After Mother and Sister were bound, Lewis, E.L., and O.L took them to Lewis's truck. Mother and Sister were "stacked" on the backseat floorboard of the truck and blankets were put on top of them. Lewis then drove everyone to his land about 45 minutes away. Once they arrived, E.L. testified that he helped Lewis take Mother and Sister out of the truck and place them on their knees. Lewis then directed E.L. and O.L. to wait in the truck. About an hour later, Lewis, Mother, and Sister came walking back to the truck. According to E.L., Lewis said during the drive home that "We don't speak about this. This didn't happen. Everybody goes to bed."

E.L. further testified that, early the next morning, Mother and Sister were gone. Lewis then directed E.L. and O.L. to pack and he drove them back to his land. They stayed there for several days in Lewis's truck before Lewis drove E.L. and O.L. to his mother's house in Mississippi. That is where Lewis was arrested.

On cross-examination, defense counsel asked E.L. whether he had previously told anyone a different version of these events. E.L. admitted that he told his mother, grandmother, and Lewis (on the phone and in letters) that these events did not occur. E.L. further testified that those statements were not truthful. He also testified that Lewis "used to whoop [him and O.L.] with a belt or choke or hurt [them]" if they disobeyed him, and that Lewis had directed him not to be truthful about the events of that night. E.L. added that he followed Lewis's orders during the kidnapping because he "wasn't exactly going to argue with the guy that had the gun that was

6

already doing something like this." And E.L. "was just trying to make sure nothing ended up happening to [him or O.L.] at the time."

O.L. likewise testified under an immunity agreement with the State. At the time of these events, he was 12 years old. O.L. stated that during the kidnapping, he and E.L. followed Lewis's instructions and taped Mother's and Sister's legs, hands, and mouths and had "held guns on them." According to O.L., they used a knife and two firearms—an AR-15 and a Glock.

After Mother and Sister were bound and "stacked" on the backseat floorboard of Lewis's truck, Lewis drove them to his land in Plantersville, Texas. There, Lewis took Mother and Sister out of the truck. O.L. testified that he and E.L. waited in the truck for about 45 minutes. Lewis then returned to the truck with Mother and Sister and he drove everyone home.

According to O.L., the next morning, Lewis drove O.L. and E.L. back to his land. They stayed in the truck for "about a week" before driving to Mississippi. O.L. testified that Lewis told him that if he was ever questioned about these events, he was to say: "[W]e didn't do that." O.L. admitted that he followed Lewis's orders and told his mother and grandmother that these events did not occur. O.L. further admitted that was not the truth.

Lewis then testified and denied that a kidnapping took place. According to Lewis, on the night in question, Sister was texting with P.H. and showed him a

7

photograph of P.H. with a man. Lewis testified that he then told Mother that he reported to immigration authorities that P.H. had taken the children, that he had contacted a divorce attorney, and that he was moving out. The next day, Lewis, E.L., and O.L. went to his land in Plantersville. Lewis also testified that when he learned that he had been charged with kidnapping, he took his sons to his mother's house in Mississippi.

Lewis noted that he is a "weapons expert" and kept knives and firearms—including a Glock. Lewis admitted that while he was jailed, he wrote several letters to his sons with specific instructions to "tell the people" "we didn't do this stuff." Lewis also admitted that he had drafted affidavits containing his version of the events, which he had instructed his sons to execute.

## Ineffective Assistance of Counsel

In his first issue, Lewis contends that his trial counsel was ineffective during the guilt/innocence phase of trial. Lewis maintains that his counsel "failed to properly impeach O.L. with his prior inconsistent statement [which] would have demonstrated that [O.L.] had previously sent a letter to [Lewis] that indicated nothing happened." According to Lewis, but for this alleged error, the outcome of his trial would have been different.

*Standard of Review*

The United States Constitution, Texas Constitution, and Texas Code of Criminal Procedure guarantee an accused the right to assistance of counsel. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. art. 1.051. As a matter of state and federal law, this right includes the right to reasonably effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Ex parte Gonzales*, 945 S.W.2d 830, 835 (Tex. Crim. App. 1997).

To prevail on a claim of ineffective assistance of counsel, an appellant must prove by a preponderance of the evidence that (1) counsel's performance fell below an objective standard of reasonableness and that (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694; *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). A failure to make a showing under either prong of the *Strickland* test defeats a claim for ineffective assistance. 466 U.S. at 697, 670 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."); *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

Under *Strickland*'s first prong, we must look to the totality of the representation to determine the effectiveness of counsel—indulging a strong presumption that counsel's performance fell within the wide range of reasonable

professional assistance and was motivated by sound trial strategy. 466 U.S. at 689; *Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006). We "must be highly deferential to trial counsel and avoid the deleterious effects of hindsight." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). "The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel." *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012).

Allegations of ineffectiveness must be firmly founded in the record. *Thompson*, 9 S.W.3d at 814. In most cases, a direct appeal is an inadequate vehicle for raising an ineffective assistance claim because the record is undeveloped, and a silent record cannot adequately reflect the motives behind trial counsel's actions. *See Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003) ("[T]rial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective."); *see also Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). In rare cases in which counsel's ineffectiveness is apparent from the record, an appellate court may address the claim on direct appeal. *Lopez*, 343 S.W.3d at 143. But, "the record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify counsel's acts or omissions, regardless of his or her subjective reasoning." *Id*.

Under *Strickland*'s second prong, we must determine whether there is a reasonable probability that the result of the proceeding would have been different. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. That an error had "some conceivable effect on the outcome" will not suffice. *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010). Rather, there must be a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt with respect to guilt. *Id.*

### *Discussion*

Texas Rule of Evidence 613(a) governs the impeachment of a witness with evidence of a prior inconsistent statement. It provides in relevant part:

(1) ***Foundation Requirement.*** When examining a witness about the witness's prior inconsistent statement—whether oral or written—a party must first tell the witness:

(A) the contents of the statement;

(B) the time and place of the statement; and

(C) the person to whom the witness made the statement.

(2) ***Need Not Show Written Statement.*** If the witness's prior inconsistent statement is written, a party need not show it to the witness before inquiring about it, but must, upon request, show it to opposing counsel.

(3) ***Opportunity to Explain or Deny.*** A witness must be given the opportunity to explain or deny the prior inconsistent statement.

(4) ***Extrinsic Evidence.*** Extrinsic evidence of a witness's prior inconsistent statement is not admissible unless the witness is first examined about the statement and fails to unequivocally admit making the statement.

TEX. R. EVID. 613(a).

11

Accordingly, to be admissible under Rule 613(a), a prior statement must be inconsistent with the one given at trial. *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002). If the witness denies or cannot recall having made the prior statement, or if his admission is partial, qualified, or otherwise equivocal, the statement is admissible for impeachment purposes. *Ruth v. State*, 167 S.W.3d 560, 566 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). However, "if the witness unqualifiedly admits making the prior inconsistent statement[], this precludes further proof [of] the statement such as the introduction of the statement into evidence." *McGary v. State*, 750 S.W.2d 782, 786 (Tex. Crim. App. 1988) (internal quotations omitted).

Here, O.L. testified that Lewis had directed him not to be truthful about the kidnapping, and O.L. explained why he complied, as follows:

Q.    Do you remember your dad ever telling you what to say about this—about this incident?

A.    Only thing close to that was we didn't do that.

Q.    Okay. And was that true?

A.    No, sir.

Q.    When you were growing up, what would happen to you if you disobeyed your dad?

A.    I got whooped.

Q.    And during this incident, what did you think would happen to you if you didn't do what your dad was telling you to do?

A.    Maybe worse.

12

On cross-examination, O.L. admitted that he had previously stated that "nothing had happened," as follows:

Q.    Initially, did you indicate to people that nothing had happened?

A.    Yes, ma'am.

Q.    And who all did you tell that to?

A.    My mother and my grandmother.

Defense counsel then asked, "And did you also write that in the letter to your dad?" O.L. responded, "I don't remember."

Later, during the direct examination of Lewis, defense counsel attempted to introduce a copy of a letter that O.L. had written to Lewis. The State objected based on hearsay, and the following colloquy occurred:

[Defense Counsel]:  This is going for the impeachment with regard to [O.L.'s] testimony with regard to what happened—directly happened with regard to this case. It's an inconsistent statement.

[State's Counsel]:  Once again, Your Honor—

[Trial Court]:  Hold on. Hold on. Okay. But shouldn't you confront [O.L.] about that?

[Defense Counsel]:  I did talk with [O.L.] about that yesterday.

The trial court sustained the State's objection, and Defense counsel made a bill of exception. In the letter, O.L. complained to Lewis that he had tried to call P.H.'s children and that they "never answer[ed]," which made him angry that "these people are trying to keep me and [E.L.] from them and they know none of that stuff is true."

13

Lewis argues on appeal that, "[a]lthough trial counsel correctly made a bill of exception regarding the excluded evidence, trial counsel did not properly go through the predicate for introducing a prior inconsistent statement with O.L. first." Specifically, Lewis contends that his trial counsel did not inform O.L. of the time and place at which his statement was made to Lewis and did not confront O.L. with the prior inconsistent statement from the letter.

Our review of the record shows that Lewis's trial counsel did not present O.L. with the statement at issue in the letter, the time and place of the statement, and did not give O.L. an opportunity to explain or deny the statement. *See* TEX. R. EVID. 613(a). And Lewis did not file a motion for new trial, in which the reasons for counsel's actions could have been developed. *See Thompson*, 9 S.W.3d at 814 ("An appellate court should be especially hesitant to declare counsel ineffective based upon a single alleged miscalculation during what amounts to otherwise satisfactory representation, especially when the record provides no discernible explanation of the motivation behind counsel's actions[.]").

Nevertheless, even if we were to conclude that the record establishes that Lewis's counsel failed to properly impeach O.L., Lewis has not shown a reasonable probability on appeal that, but for this error, the result of the trial would have been different. *See Strickland*, 466 U.S. at 694; *Lopez*, 343 S.W.3d at 142.

As discussed above, O.L. unqualifiedly admitted to having made the prior inconsistent statement, i.e., that the kidnapping did not occur. O.L. testified that Lewis had directed him to say "we didn't do that," which O.L. admitted was not true. And O.L. admitted that he told his mother and grandmother that nothing had happened. Thus, when Lewis's counsel asked O.L. whether he had "*also* writ[ten] *that* in the letter" to Lewis—O.L. had already impeached himself. (Emphasis added.) *See McGary*, 750 S.W.2d at 787 ("When the contradictions are confessed, evidently there is no use or purpose for the impeaching testimony; for this work he performs upon himself." (internal quotations omitted)).

As a result, because the impeachment value of the prior inconsistent statement at issue had already been realized, whether O.L. repeated the same statement in a letter to Lewis was of marginal value. *See Joseph v. State*, 960 S.W.2d 363, 367 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd) (holding that impeachment value of prior inconsistent statement was de minimus because credibility of witness, who was testifying under immunity agreement, had already been impeached); *see also McGary*, 750 S.W.2d at 787 n.5 ("The form of the inconsistent statement is immaterial.").[3]

---

[3]     We note that the trial court also had before it the testimony of E.L., with whom O.L. moved in tandem throughout these events, in which E.L. admitted that he had also, in the past, written letters to appellant in which E.L. had maintained that the events at issue had not occurred. And E.L. admitted that such statements were not truthful.

Moreover, the record shows that the trial court heard substantial evidence of Lewis's guilt. *See Perez*, 310 S.W.3d at 893; *Joseph*, 960 S.W.2d at 367 (noting that, in analyzing weight factfinder might have placed on error, we look to other evidence of defendant's guilt).

A person commits the offense of aggravated kidnapping if he "intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense." TEX. PENAL CODE § 20.04(b). "'Abduct' means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* § 20.01(2).

Here, Mother, Sister, E.L., and O.L. each gave testimony that corroborated one another and satisfied the elements of the offense. Multiple witnesses testified that Lewis was angry that P.H. had left; that Lewis planned the kidnapping in advance; that Lewis exhibited a knife and strangled Mother; that Lewis directed E.L. and O.L. to bind Mother's and Sister's hands, feet, and mouths with duct tape; that firearms were exhibited; that Lewis directed E.L. or O.L. to shoot Mother if she moved; that Lewis loaded Mother and Sister into his truck and drove them to a forest where he held a knife to Mother's neck; and that Mother and Sister believed Lewis would "slit [Mother's] throat." *See id.*

16

In addition, multiple witnesses testified that Lewis directed Mother and Sister not to tell anyone about the kidnapping or go to the police; otherwise, Lewis's friends would kill them. E.L. and O.L. also both testified that Lewis had directed them to falsely deny that the kidnapping had occurred. Additionally, the record includes Mother's medical records from the hospital and photographs of the wounds she suffered to her neck, chest, elbow, and wrists.

Considering the record as a whole and the totality of the evidence establishing Lewis's guilt, we conclude that Lewis has not demonstrated a reasonable probability that, but for his counsel's failure "to properly impeach O.L. with his prior inconsistent statement," the result of the trial would have been different or that the trial court would have had reasonable doubt with respect to his guilt. *See Strickland*, 466 U.S. at 694; *Perez*, 310 S.W.3d at 894.

We thus overrule Lewis's first issue.

**Credit for Time Served**

In his second issue, Lewis argues that the trial court's judgment incorrectly reflects only one day of credit for time served and that the judgment should be reformed to credit him with 769 days. The State argues that Lewis should have raised this issue in the trial court by requesting a judgment nunc pro tunc.

Article 42.03 of the Texas Code of Criminal Procedure provides, in pertinent part:

> In all criminal cases the judge *of the court in which the defendant is convicted* shall give the defendant credit on the defendant's sentence for the time that the defendant has spent:
>
> (1) in jail for the case, including confinement served as described by Article 46B.009 and excluding confinement served as a condition of community supervision, from the time of his arrest and confinement until his sentence by the trial court[.]

TEX. CODE CRIM. PROC. art. 42.03, § 2(a)(1) (emphasis added); *see also id*. art. 42.01, § 1(18) ("The judgment shall reflect . . . any credit for time served[.]").

This Court has the authority to reform a judgment that the trial court could have corrected nunc pro tunc—but only if the evidence necessary to do so clearly appears in the record. *Jackson v. State*, No. 01-16-00242-CR, 2018 WL 1003362, at *5 (Tex. App.—Houston [1st Dist.] Feb. 22, 2018, pet. ref'd) (mem. op., not designated for publication); *Houston v. State*, No. 01-09-00669-CR, 2011 WL 946979, at *4 (Tex. App.—Houston [1st Dist.] Mar. 17, 2011, no pet.) (mem. op., not designated for publication).

"Although this Court may sometimes reform [a] judgment, when an appellant has been denied credit for jail time to which he is entitled, the preferred practice is for the trial court to issue a nunc pro tunc order authorizing the appropriate credit." *Steinocher v. State*, 127 S.W.3d 160, 163 n.3 (Tex. App.—Houston [1st Dist.] 2003, pet. dism'd) (citing *Ex parte Evans*, 964 S.W.2d 643, 645 n.2 (Tex. Crim. App. 1998)). Alternatively, an inmate may file an application for a writ of habeas corpus to receive such time credit. *Id.*

Here, Lewis seeks credit for time served from September 11, 2017 through October 18, 2019. Lewis asserts that the trial court took judicial notice in another case that he was arrested by United States Marshals in Mississippi on September 11, 2017, and our record reflects that he posted bond on October 18, 2019. Lewis also seeks credit for June 10, 2022, the date on which sentence was imposed.

In *Jackson*, this Court reformed a trial court's judgment to credit the defendant with 11 additional days of time served. 2018 WL 1003362, at *5. There, we concluded that the record clearly supported at least that amount of time. *Id.* Similarly, in *Houston*, the record enabled us to reform a trial court's judgment to credit the defendant with two additional days of time served. 2011 WL 946979, at *4.

The record in this case provides no such clarity. We are unable to ascertain from this record whether the credit for jail time in the judgment is actually incorrect, and, even assuming arguendo that it is incorrect, the record does not allow us to determine what the correct jail-time credit under article 42.03 should be. Accordingly, this Court lacks the authority to change or modify this aspect of the trial court's judgment.[4] *See Steinocher*, 127 S.W.3d at 163 (declining to reform

---

[4] Again, the preferred practice is for the trial court to issue a nunc pro tunc order authorizing the appropriate credit. *See Steinocher v. State*, 127 S.W.3d 160, 163 n.3 (Tex. App.—Houston [1st Dist.] 2003, pet. dism'd). As the State notes in its brief, such outcome is not inefficient because the trial court must calculate certain jail

judgment to credit defendant with two years additional time served because record was unclear).

We therefore overrule Lewis's second issue.

## Conclusion

We affirm the trial court's judgment.


                                        Terry Adams
                                        Chief Justice

Panel consists of Chief Justice Adams and Justices Kelly and Goodman.

Do not publish. TEX. R. APP. P. 47.2(b).

---

credit upon receipt of this Court's mandate. *See* TEX. CODE CRIM. PROC. art. 42.03, § 3.  Thus, these matters may be addressed together.