ACCEPTED
06-14-00096-cv
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
6/26/2015 9:47:35 PM
DEBBIE AUTREY
CLERK

# IN THE COURT OF APPEALS

## SIXTH DISTRICT OF TEXAS

## TEXARKANA, TEXAS

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
6/29/2015 8:34:00 AM
DEBBIE AUTREY
Clerk

| | | |
|---|---|---|
| MICHAEL ANDERSON,<br>APPELLANT | §<br>§<br>§ | |
| VS. | §<br>§ | APPEAL NO. 06-14-00096-CV |
| THOMAS SNODDY,<br>APPELLEE | §<br>§<br>§ | |

---

## APPELLEE'S BRIEF

---

## APPEAL FROM THE 115th JUDICIAL DISTRICT COURT, IN AND FOR UPSHUR COUNTY, TEXAS, CAUSE NO. 548-12 THE HONORABLE LAUREN PARISH, DISTRICT JUDGE, PRESIDING

---

**L. Charles van Cleef**
**State Bar No. 00786305**

**P.O. Box 2432**
**Longview, Texas 75606-2432**
**903-248-8244 Telephone**
**903-248-8249 Facsimile**
**charles@vancleef.pro**

**COUNSEL FOR APPELLEE**

# I. TABLE OF CONTENTS. TEX. R. APP. P. 38.1(B)

I.  TABLE OF CONTENTS. Tex. R. App. P. 38.1(b).............................................- 2 -

II.  IDENTITY OF PARTIES AND COUNSEL. Tex. R. APp. P. 38.1(a) .............- 4 -

III. TABLE OF AUTHORITIES. Tex. R. App. P. 38.1(c) ....................................- 5 -

IV. STATEMENT OF THE CASE. Tex. R. App. P. 38.1(d)...................................- 6 -

V.  STATEMENT REGARDING ORAL ARGUMENT ..........................................- 7 -

VI. ISSUES PRESENTED ...................................................................................- 7 -

VII. STATEMENT OF FACTS...............................................................................- 7 -

    A.    Procedural History.............................................................................- 7 -
    B.    Factual Presentation .........................................................................- 8 -
    A.    Gary Roberts ....................................................................................- 9 -
    B.    Michael Anderson ............................................................................- 9 -
    C.    Harold Stein.....................................................................................- 15 -
    D.    Thomas Snoddy (Appellee)..............................................................- 16 -
    E.    Barry Lovely ....................................................................................- 20 -
    F.    Jonathan Wharton ............................................................................- 20 -
    G.    Michael Anderson (Second time).....................................................- 20 -
    H.    Miguel Larson .................................................................................- 20 -
    I.    George Meisenheimer......................................................................- 21 -
    J.    Final Matters ...................................................................................- 21 -

VIII.    IMPEACHMENT.........................................................................- 21 -

    A.    Summary of the Argument................................................................- 21 -
    A.    Argument..........................................................................................- 22 -
    a.    Harold Stein Impeachment ..............................................................- 23 -
    b.    Harold Stein Again ..........................................................................- 24 -
    c.    Instructions......................................................................................- 25 -
    d.    Optional Completeness ....................................................................- 25 -
    e.    What is a Transfer............................................................................- 26 -
    f.    Another Impeachment......................................................................- 26 -
    g.    The Judge Doesn't Understand Impeachment .................................- 26 -
    B.    Conclusion.......................................................................................- 28 -

IX. WEIGHT OF THE EVIDENCE........................................................................- 29 -

    C.    Summary of the Argument................................................................- 29 -
    A.    Argument..........................................................................................- 29 -

X.  Judgment Nisi .............................................................................................- 30 -

    B.    Summary of the Argument................................................................- 30 -
    A.    Argument..........................................................................................- 31 -

XI. CROSS EXAMINATION ON THE LAW .........................................................- 32 -

    B.    Summary of the Argument................................................................- 32 -
    A.    Argument..........................................................................................- 32 -

XII. CHARACTER BOLSTERING ................................................................................- 35 -

    B.    Summary of the Argument .................................................................- 35 -
    A.    Argument .......................................................................................- 35 -
XIII.    CUMULATIVE ERROR ......................................................................- 37 -

    B.    Summary of the Argument .................................................................- 37 -
    A.    Argument .......................................................................................- 37 -
XIV.    PRAYER ...........................................................................................- 40 -

XV. CERTIFICATE OF SERVICE ............................................................................- 41 -

XVI.    CERTIFICATE OF COMPLIANCE ....................................................- 41 -

XVII.    Records Exceprts ...............................................................................- 42 -

## II. IDENTITY OF PARTIES AND COUNSEL. TEX. R. APP. P. 38.1(A)

Appellant's statement is correct. TEX. R. APP. P. 38.2(a)(1)(A).

## III. TABLE OF AUTHORITIES. TEX. R. APP. P. 38.1(C)

**Cases**

Chamberlain v. State, 998 S.W.2d 230, 238 (Tex.Crim.App.1999) (en banc).......................- 37 -

Cire v. Cummings, 134 S.W.3d 835, 838–39 (Tex. 2004) .........................................- 28 -

City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex.1995).........................................- 29 -

Cortez v. HCCI–San Antonio, Inc., 131 S.W.3d 113, 119 (Tex.App.-San Antonio 2004), *aff'd*,

    159 S.W.3d 87 (Tex.2005).........................................................................................- 28 -

Fibreboard Corp. v. Pool, 813 S.W.2d 658, 695 (Tex.App.—Texarkana 1991, writ denied)..- 38 -

Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 906 (Tex. 2000).............................- 28 -

McGary v. State, 750 S.W.2d 782, 786 & n.3 (Tex. Crim. App. 1988).....................................- 23 -

Ruth v. State, 167 S.W.3d 560, 566 (Tex.App.–Houston [14th Dist.] 2005, pet. ref'd)............- 23 -

State Bar of Texas v. Evans, 774 S.W.2d 656, 658 n.7 (Tex. 1989) .........................................- 28 -

Tex. Dep't of Transp. v. Able, 35 S.W.3d 608, 617 (Tex.2000)................................................- 29 -

United Way of San Antonio, Inc. v. Helping Hands Lifeline Found., Inc., 949 S.W.2d 707, 713

    (Tex.App.-San Antonio 1997, writ denied) .........................................................................- 34 -

Williams Distrib. Co. v. Franklin, 898 S.W.2d 816, 817 (Tex.1995).......................................- 29 -

**Rules**

TEX. R. APP. P. 38.1(g).................................................................................................- 7 -

TEX. R. APP. P. 38.2(a)(1)(A)......................................................................................- 4 -

TEX. R. APP. P. 38.2(a)(1)(B)..........................................................................- 6 -, - 7 -

TEX. R. APP. P. 44.1(a)(1) ............................................................................- 28 -, - 37 -

TEX. R. EVID. 405(a)(1) ..............................................................................................- 37 -

TEX. R. EVID. 613(a)....................................................................................................- 22 -

TEX. R. EVID. 701.........................................................................................................- 34 -

# IN THE COURT OF APPEALS

## SIXTH DISTRICT OF TEXAS

### TEXARKANA, TEXAS

| MICHAEL ANDERSON,<br>APPELLANT | § | |
| | § | |
| | § | |
| VS. | § | APPEAL NO. 06-14-00096-CV |
| | § | |
| THOMAS SNODDY,<br>APPELLEE | § | |
| | § | |
| | § | |

## APPELLEE'S BRIEF

### TO THE HONORABLE JUSTICES OF SAID COURT:

Comes now L. CHARLES VAN CLEEF, counsel for THOMAS SNODDY,

Appellee herein, and files this, his "Appellee's Brief".

## IV. STATEMENT OF THE CASE. TEX. R. APP. P. 38.1(D)

Appellee is not dissatisfied with Appellant's Statement of the Case. TEX. R.

APP. P. 38.2(a)(1)(B).

## V.  STATEMENT REGARDING ORAL ARGUMENT

Oral argument would not assist the resolution of this Appeal.

## VI.  ISSUES PRESENTED

Appellee will respond to Appellant's Issues as stated in Appellee's Brief, *seriatim*. TEX. R. APP. P. 38.2(a)(1)(B).4

## VII.  STATEMENT OF FACTS

Appellant's Statement of Facts essentially restates Appellant's contentions in the trial of this case, which were rejected by the jury, and contains argument, and, therefore, fails to comport with TEX. R. APP. P. 38.1(g).  Accordingly, Appellee offers the following Statement of Facts. TEX. R. APP. P. 38.2(a)(2)(B).

### A. PROCEDURAL HISTORY

This case began with the August 31, 2012, "Original Petition and Request for Disclosure" wherein the appellant claimed that he had been in a bail bond partnership with the appellee and, when the partnership ended, that the appellee tortuously interfered with contracts and future business relationships by diverting the telephone number. CR (vol. 1) 1-8.  A First Amended Petition was filed on January 14, 2013, claiming that the appellant had recently discovered that the appellee never filed any financial statements with the Sheriff, and "that he had contributed nothing to the partnership," thereby adding breach of contract and fraud claims against the appellee. CR (vol. 1) 16-17.  The March 7, 2013, Second Amended Petition added a claim that the appellee had something to do with

- 7 -

another bondsman impersonating the appellant, and thus added a claim for vicarious liability for that bondsman's "attempted fraud." CR (vol. 1) 23-24. The Third Amended Petition, filed October 22, 2013, reconstituted the claim regarding another bondsman as a "civil conspiracy". CR (vol. 1) 29. The final, fourth, amended petition further alleged a breach of fiduciary duty. CR (vol. 1) 35.

The parties designated numerous witnesses and exhibits and filed motions in limine in preparation for trial. Jury selection occurred on October 13, 2014. RR (vol. 2). Trial began on October 21, 2014 and concluded on October 23, 2014, with a finding against Plaintiff as to all issues. RR (vols. 3, 4, and 5); CR (vol. 1) 65-78 (jury charge and answers, signed by judge).

## B. FACTUAL PRESENTATION

This case concerned the dissolution of association between Appellant and Appellee in the bail bond business. Appellant made numerous claims, outlined above. The gravamen of the claims was the Appellant claimed that Appellee entered into a partnership with him to run a small bonding office in Gilmer, Upshur County, Texas. Appellee, who had the Gilmer office, its telephone number, its furniture and advertising, and its utilities long prior to Appellant coming to his attention, and approximately 15 years' experience in the bonding business in several places including Longview, Texas, claimed that there was no partnership

and that Appellee's allegations of promises made and broken were untrue. Several witnesses testified.

## A. GARY ROBERTS

The first witness was Gary Roberts. RR3 at 29, *et seq*. Mr. Roberts testified that he had spoken with the appellee about conducting bonding business in Upshur County as a partnership, "more or less." RR3 at 30-31. He backed out of the arrangement in favor of the appellant, who had more time to devote. Ibid. at 31. On cross-examination, Mr. Roberts admitted that he never did enter into an agreement or write a single bond; he was not aware of the appellant having any prior experience writing bonds (he had known the appellant for several years in another State). Ibid. at 32-33.

## B. MICHAEL ANDERSON

The second witness was the appellant, Michael Anderson. RR3 at 36, *et seq*. Mr. Anderson testified that he was in Tennessee when he received a call from Mr. Roberts about a job offer to run a bail bond office. Ibid. at 37. He testified that he met the appellee and that the appellee stated that he had a bonding office in Upshur County that was not making money and that he wanted to show someone how the process worked. He claims that he began writing bonds on January 1 (2010). Ibid. at 38. He claimed that the appellee said that he owned the business and did not have time to run it, so he was considering shutting the doors. Ibid. at 39.

Appellant claimed that since the appellee owned the business he was the "financial backer," meaning that the appellee satisfied the Sheriff that there was sufficient collateral for bonds. Ibid. at 41-42. Appellant testified that he heard from an individual named "Harold," in early 2011 that caused him to be suspicious. Ibid. at 43. He asked the appellant about the call from "Harold" and was told that it was a misunderstanding. Ibid. at 44. At some point, the appellant requested a copy of the "folder" for the bonding business that was on file with the Sheriff's office and, the appellant claimed, there were no "financials" in the folder. Ibid. at 48. Immediately contradicting himself, the appellant identified a "financial verification packet" that was produced, to him by the Sheriff, in the folder indicating that the ultimate surety was "Gerald Todd" from Collin County, dated January, 2003. Ibid. at 49.[1] The appellant testified that he believed that he was personally liable on the bonds (approximately million dollars' worth). Appellant's trial counsel then produced text messages between the appellant and the appellee. Ibid. at 53 (identified as Exhibit 2). The appellant's trial counsel had him read/interpret the text messages, which indicated that "Harold" was going to Gilmer (presumably, the office) and that the appellee needed to meet with the appellant regarding some things that he had sent in the mail; the balance of the text messages were to the

---

[1] Appellant later admitted that it was a financial statement but claimed it wasn't "valid" because the Sheriff should have required a more recent one. RR3 at 121-127. Appellant did not believe the surety, Gerald Todd, exists because he had never met him. Ibid. at 125-126. The transcript reveals the extraordinary questioning required to untangle Appellant's testimony on these subjects.

effect that the arrangement between the appellant and the appellee was being ended by the appellant. Ibid. at 55. He read the appellee's message stating "okay, then we need to get files and the money you owe and move on." Ibid. at 55. The appellee asked the appellant to call and stated that if he wanted to go that was fine, there would be no hard feelings. Ibid. The appellant testified that the appellee stopped paying or cut off the utilities to his office. Ibid. at 56. The appellant further testified about the phone line being transferred away. Ibid. at 63. The appellant then testified about an alleged incident in which someone called to speak with him and another bondsman (not the appellee) answered the phone. Ibid. at 66-68. Finally, the appellee testified some regarding money matters in the office and how his share was calculated. Ibid. at 69-78. However, when the appellant attempted to introduce an exhibit purporting to summarize financial documents that were in evidence, the appellant, the undersigned took him on *voir dire* and establish that he had no expertise the qualified him to do so. Ibid. at 79-81.

Cross-examination was lengthy and began with a discussion of how the bonding business works, including the fact that, as a bondsman, the appellant would have contact information for the principals and their families. Ibid. at 83-84. He admitted that he had no prior experience as a bondsman before working with the appellee. Ibid. at 84-85. He admitted that the office in Gilmer, Upshur County, Texas was already in place before he met Mr. Snoddy and that the office

had an established telephone number. Ibid. at 85-86. He knew that the phone line belonged to the appellee and that the number was already the subject of paid advertising. Ibid. at 86. He testified that there was no written partnership agreement and that he did not believe that he and the appellee would even have to have their heads together in order for there to be a partnership, then admitted that there was no partnership simply because he thought so. Ibid. at 88. Ultimately, he agreed that there would have to have been a meeting of the minds on the subject of a partnership. Ibid. at 89. He was aware that, when he met the appellee, the appellee had numerous businesses and extensive experience in the bonding business. Ibid. at 89. He was aware that the appellee had invested in advertising, and office, and "infrastructure" at that location. Ibid. He never filed a partnership tax return even though he had his own accountant. Ibid. at 90. Though he had an employee or employees he never filed W2's or 1099's regarding their pay. Ibid. at 90. When he filed a DBA form with the county during his time in association with the appellee, he filed it as the "proprietor." Ibid. at 91. He admitted that the appellee told him that he would be taught the business, and the appellee did so. Ibid. at 91-92. The software and checks and balances for the business were put in place by the appellee. Ibid. at 92. He acknowledged that he was not the first person to work in that office, that the office was not set up for him, and he was unaware of any person who had ever been or claim to be a partner with the

appellee. Ibid. at 93-94. The first day he appeared at work the office was in place, had electricity and the telephone, and a system for tracking bonds. Ibid. at 94. When asked why he was suing the appellee when the appellee had the same telephone number for many years, the appellant responded "because I was there in the business, my name was, was the business." Ibid. at 96. He acknowledged that he never paid the appellee for the telephone number. Ibid. at 98. He acknowledged that hundreds of pages of telephone records ordered by the appellant's attorney for the trial indicated that the telephone number had belonged to "fast action bail bonds" (owned by the appellee) for years prior to the appellant's arrival. Ibid. at 98-99. Harkening back to his testimony regarding the contact information for bond principals, the appellant ultimately admitted that he could have used another phone to contact those persons regarding court (and failed to establish that he could not contact anyone in particular) after the Fast Action phone number was forwarded elsewhere. Ibid. at 100-101. He further admitted that payments he received on bonds following the "breakup" of the "partnership" were neither paid nor accounted to the appellee. Ibid. at 102. He acknowledged that the electric bill was in the appellee's name. He admitted that the sheriff was satisfied with whatever financial information was on file with that office and that he was never refused the right to write a bond. Ibid. at 107-109.

Regarding the financial statement on file with the sheriff, the appellant believed that the sheriff was not following the law, and acknowledged that the financial statement on file, which he characterized as being for "Snoddy Bail Bonds," was actually just faxed from Snoddy Bail Bonds (it had a fax cover page with that business letterhead; Appellant's prior testimony was "wrong"). Ibid.at 115-121. The appellant evidenced his confusion regarding "Harold" (who had called him) and "Gerald" Todd, who was the surety. This was cleared up during trial. Ibid.at 116-121.

Appellant testified about how he was paid, Ibid.at 138, and claimed that he did not believe that appellee every paid the surety because he did not see the checks. Ibid. at 140. He didn't believe there were any checks because he never saw them. Ibid.at 141.

Appellant claimed that Appellee prevented him from checking the financial information in the Sheriff's Office while they were associated, even though Appellee was in another city and Appellant is a "grown man"; he ultimately admitted he could have just walked into the Sheriff's Office and viewed it anytime, but he did not do so until 2012, even though he had been "concerned" since 2010. Ibid.at 162.

The balance of Appellant's testimony adds little to the background of this case.

## C. HAROLD STEIN

The next witness was Harold Stein, who was called on <u>direct</u> examination. RR3 sat 215. Mr. Stein is the "Harold" mentioned above, has approximately 40 years' experience in the bonding business, and is a bond underwriter. <u>Ibid.</u> at 216; <u>Ibid.</u> at 229. He explained that he was the broker for the bonding operation and acted on behalf of the surety, Gerald Todd. <u>Ibid.</u> at 220-221. He explained that the appellant was protected from bond forfeitures if he just signed the bonds correctly (as agent). <u>Ibid.</u> at 227; <u>Ibid.</u> at 279. Mr. Stein had also suffered a head injury that affected his ability to recall, which was reported during his deposition, and was deprived the right to review his deposition for changes. <u>Ibid.</u> at 229-231. He explained that in the hierarchy, the appellant was a "producer," that he (Mr. Stein) was a broker, that the appellee had many duties who ensured that the producer was doing things correctly and reported to the broker, and, as noted above, that Mr. Todd was the surety. <u>Ibid.</u> at 236-242; <u>Ibid.</u> at 255-257. The appellee was a "buffer" between the producing operation and the suretyship. <u>Ibid.</u> at 242. This was all explained on a chart for the jury (demonstrative). He explained that if the appellee ever identified him as the surety that the correct term would have been "surety representative" and that it was an understandable mistake. <u>Ibid.</u> at 243-245; <u>Ibid.</u> at 283-284. The appellee had, at one time, been in the "producer" position. <u>Ibid.</u> at 244-245. He explained how he was paid, which was through

- 15 -

payments to the surety; meaning that if he was being paid the surety was also being paid. Ibid. at 248-249; Ibid. at 276-278.[2] On redirect and recross examination, Mr. Stein cleared up another confusion on the appellant's part about the name "Surety Company," which, though descriptive of the purpose of the company was also the proper name of the company. Ibid. at 259-260. He cleared up that, under the law, as long as the sheriff was satisfied as to the soundness of the surety for a particular bond, the bond was approved and business operated is normal. Ibid. at 267-268; Ibid. at 277-278; Ibid. at 280-282. There were several attempts by the appellant to impeach Mr. Stein, the appellant's own witness, none of which were successful.

### D. THOMAS SNODDY (APPELLEE)

Next, the appellant called the appellee as an adverse witness. Ibid. at 286. The appellee cleared up that he never offered Gary Roberts a "partnership" and that the appellant was simply lying when he testified that the appellee offered him a partnership. RR3 at 291-292. He was asked about the profit breakdown and what he did for the operation. Ibid. at 291-293. Appellant continued to evidence confusion over what a "surety" is. Ibid. at 294-295. The appellant attempted to obtain legal conclusions from the appellee regarding ownership of the telephone line and the definition of a partnership. Ibid. at 298-299. The appellee clarified that he was a "consultant" for the operation and his duties. Ibid. at 300-305; Ibid.

---

[2] Elsewhere, appellant explained that he received 50% of the monthly profit, that 50% went to the appellee and 35% of the appellee's payment went to the surety, while expressing doubts that the surety was ever paid. Mr. Stein cleared that up.

at 321-322 (examples). He corrected appellant's misunderstanding that 50% +50% -35% of the second 50% did not add up to 135%. Ibid. at 302-304. He clarified that the appellant was focusing on a DBA form for a different business in his questioning. Ibid. at 312-313. He testified that he was dealing with Mr. Stein for the surety and that the business ran smoothly. Ibid. at 327-330.

The following day, October 22, 2014, court began with the appellee on the stand. RR4. He clarified that he allowed the appellant to use his well-established phone line. RR4 at 11-12. He testified that he gave the appellant ample time to get his own telephone number when the appellant decided to leave his association with the appellee. Ibid. at 18-19. The appellee testified that the appellant should have known that if he wanted to disassociate he would need to get his own electric, water, and telephone accounts. Ibid. at 19. He gave the appellant three or four weeks to get this done. Ibid. at 20. The appellant then transferred the phone line, at least momentarily, to another bondsman so they would continue to receive bonding business. Ibid. at 21-22. After numerous failed attempts at impeachment, the court thoroughly explained the process to the appellant's attorney in another failed bid that violated the appellant's own motion in limine and opened the door for an optional completeness reading of the rest of the passage. Ibid. at 22-29.[3] He

---

[3] The Court tried explaining it again, later, to no avail. Ibid. at 110-112.

clarified that the appellant worked for himself and was responsible for his own taxes, employees, etc. Ibid. at 35-36.

On cross-examination the appellee testified that he been in business for approximately 15 or 20 years, was a licensed bondsman (in bail bond board counties), had money invested in advertising his telephone numbers, obtained utilities and furniture for his offices, described how he ended up with an interest in Upshur County, and how he came in contact with the appellant. RR4 at 55-58. He explained that he had never, in the course of his entire career in bonding, submitted a personal financial statement as opposed to a surety statement in a non-bail bond board County as Appellant seemed to expect. Ibid. at 60-61. He had no intention of entering into a partnership with either Mr. Roberts or the appellant, never agreed to do so, and described exactly what the appellant was supposed to do at the office. Ibid. at 61-62. He explained how profits were split up and however one was paid. Ibid. at 61-62. He testified that he, through Mr. Stein, ensured that a suretyship was in place, to the satisfaction of the sheriff. Ibid. at 62-64. He explained that his accountant prepared his taxes from the spreadsheets that were in evidence, and that he did not keep checks. Ibid. at 65-66. He explained his duties to Mr. Stein and that he always did them. Ibid. at 66-67. He testified that he had done everything that he told Mr. Anderson, the appellant, that he would do. Ibid. at 66. He reiterated that the appellant filed a form with the county indicating that his, the

- 18 -

appellant's, operation was a "sole proprietorship," and that fact was demonstrated again to the jury. Ibid. at 69-70. He was aware that money that the appellant was responsible for was missing and that he and Mr. Stein were concerned about it. Ibid. at 71-73. When he confronted the appellant about at the appellant stated that he did not have the money to pay back so the appellee reported it to Mr. Stein and tried to help the appellant get a loan to pay the money. Ibid. at 73-74. Appellant did not qualify for the loan so the appellee took alone and the appellant was supposed to pay him monthly until the loan was satisfied. Ibid. at 75. There were a total of three discrepancies from Appellant's work at the office that were brought to light. Ibid. at 76.-78. When the third incident came to light the appellant said that he wanted to do something different. Ibid. at 78-79. This explained the text messages between Appellant and Appellee that the appellant had testified about but did not seem to understand (his own text messages) regarding "money." Ibid. at 80-81. He said that if the Sheriff had been unsatisfied with the financial surety he, the sheriff, certainly had authority to ask for something new. Ibid. at 83. The Sheriff never did that. Ibid. at 83. He identified the financial statement that was on file and that made the business possible. Ibid. at 83. He summed that the appellant was essentially paying a portion of his profit for the use of the business location and for the appellee's services both to him and to Mr. Stein on behalf of

- 19 -

the surety. Ibid. at 89-90. Everyone had an interest in ensuring that Mr. Anderson, the appellant, was making money because if he did not, they did not. Ibid. at 90.

### E. BARRY LOVELY

The next witness was Barry Lovely, a former bondsman. RR4, beginning at 123. The substance of his testimony was that he did not impersonate the appellant on the phone but, to the contrary, that the appellant verbally assaulted him after luring him to Gilmer from his home to do a bond. Ibid. at 138-141. He testified about the appellant stalking him as well. He explained why one bondsman would transfer the telephone number to another bondsman (to make sure the calls were answered). Ibid. at 128-138. This was all reiterated on cross-examination. Ibid. at 141-153.

### F. JONATHAN WHARTON

The appellant's trial counsel then testified regarding attorney fees. RR4 at 153-161.

### G. MICHAEL ANDERSON (SECOND TIME)

Appellant's counsel then called him back to the stand to testify regarding alleged damages. RR4 at 161-175.

### H. MIGUEL LARSON

Appellant then called a sheriff's deputy, Miguel Larson, who had been operating the metal detector immediately prior to being called as a witness. Ibid. at 186. Deputy Larson was placed on the stand briefly and he knew nothing about

the case nor the subjects of information that the appellant wanted to ask about. He was dismissed. Ibid.at 201-206.

At that time, following some discussion outside the presence of the jury, the appellant rested.

### I. GEORGE MEISENHEIMER

Appellee called George Meisenheimer, a banker who considered a loan request from Appellee. Ibid. at 214-216. The loan was denied. Ibid. at 216. The stated reason for the loan was business working capital, not furniture as alleged by the appellant and his testimony. Ibid. at 216-217. He did remember the appellee then coming in to take a loan for the same purpose. Ibid. at 218.

### J. FINAL MATTERS

The parties and court then took up the issue of the charge and there were no objections to the ultimate charge. Ibid. at 223.

Since the appellant had called all of the appellee's witnesses, with the exception of the banker, the appellee then rested. Both parties closed. As stated above, the jury returned a verdict in favor of the appellee.

## VIII. IMPEACHMENT

### A. SUMMARY OF THE ARGUMENT

Appellant contends that he was continuously interrupted by the court and admonished for improper impeachment. He claims that no objections were made

by the appellee's attorney, and that the first time this happened was in the questioning of Harold Stein.

It is true that appellant's counsel was interrupted numerous times for improper impeachment. The attempted impeachments were patently improper. The objections in this case were numerous and Appellant's improper impeachments were frequent; at times the undersigned objected, at others he jumped up or startled in his chair. The impeachments were open and obvious because Appellant's counsel would walk toward the witness with a transcript or simply start reading it. Even after the court explained impeachment to the appellant's counsel, he continued to get it wrong, principally because the statements were not inconsistent.

## A. ARGUMENT

The law is well established: TEX. R. EVID. 613(a) provides the context in which a witness may be impeached with a prior inconsistent statement. See Ibid. When a witness is examined about a prior statement, Rule 613(a) requires that the witness be told: (1) the contents of the statement; (2) the time and place the statement was taken; and (3) the identity of the individual to whom the statement was made. TEX. R. EVID. 613(a). The witness must be given an opportunity to explain or deny the statement before it is admitted to the jury. Ibid. If the witness unequivocally admits having made the statement, extrinsic evidence of the same

shall not be admitted. Ibid. "If the admission is partial, qualified, or otherwise equivocal, or if the witness claims to not remember making the prior statement, the prior statement is admissible for impeachment purposes." Ruth v. State, 167 S.W.3d 560, 566 (Tex.App.–Houston [14th Dist.] 2005, pet. ref'd) (citing McGary v. State, 750 S.W.2d 782, 786 & n.3 (Tex. Crim. App. 1988)).

Appellant's lengthy rendition of the law ignores the most basic point: in order to impeach a witness with a prior statement is must be inconsistent. Unfortunately, Appellant did not make a record of the statements, with one exception (which was actually made by Appellee's counsel under the rule of optional completeness), leaving nothing for this Court to decide.

### a. HAROLD STEIN IMPEACHMENT

The first instance alleged by the appellant concerns the testimony of Harold Stein. Appellant's Brief at 18. Appellant's counsel was standing at the witness stand with a deposition transcript in his hand. Mr. Stein testified that Gerald Todd was the surety for the bonding concern. RR3 221. As noted above, this information had been known to the appellant since 2012, when he obtained the Sheriff's department file. As the record reflects, the appellant's counsel was attempting to "impeach" Mr. Stein—his own witness—with a deposition transcript that, he admitted, did not contain a question to that effect. In other words, Mr. Stein testified that no one had asked him who the surety was before that very day

in court—no one, including the appellant's counsel. There was nothing to impeach. Judge Parish was correct that this was improper impeachment. Significantly, on this first event, as noted in the appellant's Brief, this is when the court attempted to explain impeachment procedure to the appellant's counsel. Appellant's brief at 19, quoting RR3 221-223.

### b. HAROLD STEIN AGAIN

The second instance is nearly identical. Appellant claims that prior to trial, Mr. Stein claimed that he was a bond broker and that during trial he claimed that he was a broker for sureties. Appellant's brief at 19. Once again, as revealed within the appellant's Brief and quoted portions of the transcript, Mr. Stein had not been asked that question before; he had not been asked about all of his jobs. There was no inconsistent statement. Also, that portion of the appellant's Brief highlights the appellant's confusion between a/the surety company and "Surety Company," the latter of which is the proper name for Mr. Stein's superior in the business hierarchy. Ibid. at 20-21. Put simply, the appellant's attorney had not asked the witness anything about surety brokerage during his deposition, could not identify any question that should have elicited that response, and there was nothing in the transcript with which to impeach him. When the trial judge asked him to identify the question in the deposition, the appellant's counsel identified two full pages, then admitted that the portion he wanted to read with a narrative that was

not in response to a question. Judge Parish's ruling, sustaining the undersigned's objection, was correct.

### c. INSTRUCTIONS

The undersigned did, as alleged in the appellant's brief, ask the court to instruct the jury that that was not impeachment because, in fact, it was not. This was part of a repeated pattern of the appellant's counsel walking to the witness with a deposition transcript and pretending to catch him in a lie, resulting in no such lie being demonstrated.

### d. OPTIONAL COMPLETENESS

The next complaint concerns invocation of the rule of optional completeness after the appellant's attorney began a failed impeachment, again, and skipped portions of the alleged impeachment testimony. Appellant does not assign any particular error to this, and there is none. Appellant refers to the procedure of "voir dire" as though it is an unfamiliar concept.

Appellant refers to an attempted impeachment that begins on RR4 at 21 of the appellee in which he was trying to cobble together an impeachment with several questions. The appellee read that portion and affirmed that that was just what he had said in court. Ibid. at 21-22. Discussion continued, at the bench, during which the court instructed, again, the appellant's counsel how to properly impeach a witness. Ibid. at 25. Optional completeness was allowed after the failed

impeachment to show that the appellant had, in fact, said the same thing in his deposition that he said during trial. Ibid. at 26-27. Appellant then wanted appellee to stop reading in the middle of a sentence which was included in his original impeachment offer. Ibid. at 27. Appellant, and his failed impeachment, had "opened the door" to this limine matter. Ibid. at 27-29. The Court's rulings were correct.

### e. WHAT IS A TRANSFER

Appellant claims that the trial court erred in asking a witness, when he said that a number was transferred to him, what that meant. RR4 at 134-135; Appellant's Brief at 26. This was occasioned by parties and attorneys using different words for "forward". It is unclear what legal argument is made but, at least, it became clear that "forward" was the proper description.

### f. ANOTHER IMPEACHMENT

Another botched impeachment is the subject of the next complaint. Appellant's Brief at 27-28. Again, the court tried to help the appellant's attorney with the proper procedure and, once again, the appellant failed. The reasons are patent in the quoted portion of the transcript. Appellant's brief at 28; RR4 at 126-129. It was not a proper impeachment.

### g. THE JUDGE DOESN'T UNDERSTAND IMPEACHMENT

Appellant next contends that the trial judge did not understand how impeachment worked and required that the identical question be asked at trial as

was asked during the deposition. Appellant's brief at 29. In fact, the Court directly informed the appellant's counsel that, "As long as it's in the same context it's not a problem." RR4 22-25. That is noted in the quoted portion of the transcript in Appellant's Brief. Appellant's brief at 29. The fact was that every attempted impeachment was <u>not</u> in the same context, consisted of a jumble of questions or a narrative answer, or amounted to the fact that a particular question had never been asked in deposition by the appellant's counsel.

It is astonishing that at this stage of the case, on appeal, after a chance for research and reflection, there is still a complete misunderstanding on the part of the appellant concerning proper impeachment procedure and what is proper impeachment. In each of the instances identified in the appellant's brief (as well as many others, which are not mentioned in the brief) there was no actual impeachment. Rather, Appellant seemed to wish to simply read transcripts and statutes and present his case through Appellant's personal testimony and impeachment of almost every other witness. Each time, the appellant's attorney approached the witness, transcript in hand, as though he had caught the witness in a lie. This happened so frequently that the undersigned humbly suggests that the appellant's counsel has mistaken the Court's kindness in trying to help him make a <u>proper</u> impeachment (though none existed in this case)—as opposed to frustrating his presentation—and that a fair reader of the record could also conclude that

Appellant's multiple trips to the witness stand were an intentional tactic to make each witness appear to be a liar.

## B. CONCLUSION

The appropriate standard of review for evidentiary rulings is abuse of discretion. Appellate courts review a trial court's decision to admit or exclude testimony under an abuse of discretion standard. Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 906 (Tex. 2000). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles; in other words, the appellate must decide whether the act was arbitrary or unreasonable. Cire v. Cummings, 134 S.W.3d 835, 838–39 (Tex. 2004). The appellate court must uphold an evidentiary ruling if there is any legitimate basis for it. State Bar of Texas v. Evans, 774 S.W.2d 656, 658 n.7 (Tex. 1989). If there is error in the admission or exclusion of evidence, court examine the entire record to assess the harm caused by the error. See Cortez v. HCCI–San Antonio, Inc., 131 S.W.3d 113, 119 (Tex.App.-San Antonio 2004), *aff'd*, 159 S.W.3d 87 (Tex.2005). This court reverses based on the erroneous admission or exclusion of evidence only if the appellant shows error that was calculated to cause and probably did cause the rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1); Cortez, 131 S.W.3d at 119. Accordingly, the appellant must demonstrate that the excluded evidence was both controlling on a material issue and not cumulative of other evidence. Tex.

Dep't of Transp. v. Able, 35 S.W.3d 608, 617 (Tex.2000); Williams Distrib. Co. v. Franklin, 898 S.W.2d 816, 817 (Tex.1995). Erroneous evidentiary rulings are usually not harmful unless the case as a whole turns on the particular evidence in question. City of Brownsville v. Alvarado, 897 S.W.2d 750, 753-4 (Tex.1995).

## IX. WEIGHT OF THE EVIDENCE

### C. SUMMARY OF THE ARGUMENT

Appellant's counsel next complains that the court, in instructing the jury that impeachments were improper, commented on the weight of the evidence. This completely ignores that most of the discussion of improper impeachment was in the context of an objection and ruling that occurs in front of the jury, that the improper impeachment procedures are not "evidence," and that there was not a single objection to the court's instructions.

### A. ARGUMENT

As correctly stated by the appellant, the judge should not "convey his or her opinion of the case to the jury and ultimately influence the jury's decision." Moreno v. State, 900 S.W.2d 357, 359 (Tex. App.—Texarkana 1995, no pet.). Appellant also correctly notes that when no objection is made to the comment, incurable harm must be shown. State v. Wilemon, 393 S.W.2d 816, 818 (Tex. 1965).

Improper impeachment is not evidence. It is improper procedure and, especially given the number of times it occurred in this case, created the unfair

impression that the appellant's attorney was catching witnesses in lies when he failed to do so a single time. The court was just repeating its ruling that the impeachment was not proper, which the jury had already heard, and that did not refer to evidence—it referred to counsel's failure to follow procedure or identify an inconsistency. The undersigned admits puzzlement at this claim for relief. Appellant goes on to fault the court for discussing, with counsel, an improper impeachment objection in which two statements—one before trial and one at trial—were allegedly different; that is the judge's job—to determine whether it was proper impeachment and sustain or overrule an objection. Appellant alleges that this case was a contest of credibility, which is true, <u>as to the witnesses not the attorneys</u>. The trial court committed no error.

## X. JUDGMENT NISI

### B. SUMMARY OF THE ARGUMENT

Appellant's counsel next complains that Judgments Nisi were improperly excluded from evidence.

A cursory review of the transcript reveals that Appellant's counsel thought Judgments Nisi were like normal judgments; they were excluded because they had never been disclosed or listed as exhibits, demonstrated the beginning of a bond forfeiture not the end, and were being offered to show "judgments against Mr.

Anderson individually." Appellant's counsel claimed that he obtained them during trial.

## A. ARGUMENT

This discussion begins on RR4 at 209. The Judgments Nisi were offered to show "Judgments against Mr. Anderson individually for the Fast Action Bail Bonds forfeitures." Ibid. at 209. They were not disclosed either generally or specifically in response to the request for disclosure nor the court's pretrial order that exhibits be exchanged prior to trial. Their existence could not have been a surprise to Appellant because the business relationship ended years before trial. They were a complete mess-- some of them were not certified, some of them did not show when the bonds were made (in other words, during the association between the appellant and appellee), there was no indication how they were resolved, and, most significantly, they represented the beginning of a bond forfeiture case and not the end. RR4 212; RR5 7-8. Finally, in keeping with the appellant's trial theory, there had been no evidence that the judgments were ever submitted to the appellee or the surety (not that they would have been, because they did not represent the end of the case triggering the need for payment) for payment. RR5 at 10-12. Appellant's counsel did not seem to understand the terminology of a "judgment nisi" at trial. Undeterred, on appeal, he now understands what a judgment nisi is, but claims that because Mr. Anderson's (the

Appellant's name) was on them, he <u>would</u> have to satisfy a judgment. This, of course, is correct, if one ignores the dozens of pages and common knowledge of what a surety is. In a car accident the individual at fault is sued personally, but a judgment is paid by his insurance, if he has any. That, and that fact that no ultimate money damages were shown, is why the court properly excluded the judgments nisi as irrelevant. It did not support any theory, would have confused the jury, and was properly excluded as a class of evidence.

## XI. CROSS EXAMINATION ON THE LAW

### B. SUMMARY OF THE ARGUMENT

Appellant next complains that the court improperly and not allow him to read statutes and ask lay witnesses to respond to them.

Each time the appellant's counsel asked these questions, the undersigned objected "calls for a legal conclusion," or words to that effect and the court properly sustained the objection.

### A. ARGUMENT

Appellant points this Court's attention to RR3 298-99 and RR3 305-306, where he tried to produce section 152.102 of the Texas Property Code for the court to read, and where he, despite the sustained objection, simply read the law to the witness.

No witness in this case was qualified as a legal expert and, even if one had been, he would not have been allowed to testify on the ultimate issue(s). What

- 32 -

Appellant now couches as a question about ownership was actually a hypothetical legal question at trial:

\*\*\*

> …When -- when partners -- so if you, for example, had --
> when you contribute property to a partnership do you -- is
> it -- do you think or do you believe that you retain
> ownership of it, that it's still yours even though you
> terminated the partnership?
>
> MR. VAN CLEEF: Objection, Your Honor.
>
> This calls for a legal conclusion.
>
> THE COURT: Sustained.

RR3 at 298. Counsel then tried to tender a printout of Section 152.102 of the Texas Property Code, "[f]or judicial notice that this is the law." Ibid. The trial court informed him that she knew the law, that he cannot ask the witness to testify as a legal expert, and sustained the objection again. Ibid.at 298-299. Undeterred, counsel's next question of the same witness was:

> Q. (By Mr. Wharton) All right. So let me – let me pose a hypothetical
> to you based on this law. So property is partnership property if
> acquired in the name of one or more partners regardless of whether
> the name of the partnership is indicated if the instrument transferring
> title to the property --
> MR. VAN CLEEF: Your Honor, I object. This is not a question. He is
> reading the law to a witness who is not qualified to --

THE COURT: Sustained, and I'll instruct the jury on the law when it's time.

RR3 at 299. Still undeterred, a few minutes later, Counsel asked of the same witness (reading the statute):

Q. Okay. Do you know the -- have you gone over all the rules for determining if a partnership is created?
A. Yes.
Q. Okay. So you're aware of the factors would include receipt or right to receive a share of the profit of the business, expression of an intent to be partners in the business, participation or right to participate in control of the business.
MR. VAN CLEEF: Your Honor, this would be a multi-part question or he's just reading the law again and I object.

RR3 305. This objection was sustained again. RR3 305-306. Counsel was determined to ignore the judge's ruling, read the law to the jury, and ask the witness hypothetical and other legal questions that he had not been qualified to answer. The Court's ruling were correct. Appellant fails to explain why a witness's understanding of the law has any relevance in the case. In this appeal, the appellant correctly states the law on ultimate legal questions, but does not even argue the qualification of any witness to render a legal opinion on his statutes and hypotheticals. A lay witness's opinion on the law is not evidence for the jury to consider. See TEX. R. EVID. 701 (outlining permissible opinion testimony for non-expert witnesses); United Way of San Antonio, Inc. v. Helping Hands Lifeline Found., Inc., 949 S.W.2d 707, 713 (Tex.App.-San Antonio 1997, writ denied) (A

lay witness "may not give legal conclusions or interpret the law to the jury"). Judge Parish's rulings were correct.

## XII.  CHARACTER BOLSTERING

### B. SUMMARY OF THE ARGUMENT

Appellant next complains that Appellee improperly bolstered Barry Lovely (a witness) by asking Appellant's own witness (Harold Stein) if he thought that Barry Lovely (who Appellant accused of conspiring with Appellee to tortuously interfere with Appellant's business) "does underhanded business practices." Appellant objected that his own witness (Mr. Stein) could not "testify in character like that, unless he's a character witness." The objection was overruled.

The question was proper and the court's ruling was proper as well.

### A. ARGUMENT

The question and answer appear at RR3 at 258-259. The testifying witness was Appellant's own witness, Harold Stein, and the question concerned Barry Lovely. In his Third and Fourth Amended Petitions, Appellant accused Barry Lovely of "civil conspiracy" with Appellee through trickery of a telephone line, as detailed above. Mr. Stein had known Mr. Lovely for eighteen years and had helped Mr. Lovely start his own bonding business, was asked on cross-examination, "[i]d it your impression that Mr. Lovely has – does underhanded business practices." RR3 at 258. Appellant objected that "[y]ou don't get to testify in character like that, unless he's a character witness." RR3 at 260. The court

- 35 -

overruled the objection and Mr. Stein responded "I don't know of any underhanded." Ibid.

As an initial matter, any error was waived because the objection states nothing for the Court to decide. Character witnesses in the sense stated in the objection exist in criminal trials, not civil trials. Mr. Stein was simply a "witness"; one called by Appellant.

Second, "I don't know of any underhanded," does not amount to character evidence.

Third, Barry Lovely was, in fact, accused of conspiring with Appellee to tortuously interfere with Appellant's business, so asking Appellant's own witness of his impressions (even if fruitlessly) is within the ambit of relevant cross examination.

Fourth, this did not concern a specific character trait (such as truthfulness, honesty, or piety).

And fifth, the next question was not objected to:

(By Mr. Van Cleef) In the roughly nineteen 12 years you've known him that's not been an issue for you?
A. Not for me it has not.

RR3 at 259.

Appellant had previously testified about Barry Lovely allegedly trying to steal his business as "one of [Appellee's] associates." RR3 at 66-68; See Ibid.at

205 (counsel described Mr. Lovely's conduct as "actionable conduct"). Norman Chism had also already testified about the alleged incident. RR3 204-214.

Mr. Lovely was an alleged co-conspirator. As noted by Appellant in his brief, ""When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion." TEX. R. EVID. 405(a)(1). It is only on cross examination (as was the case here) that specific instances of conduct may be inquired into. TEX. R. EVID. 405(a)(1)."

The Court did not err in overruling the objection.

## XIII. CUMULATIVE ERROR

### B. SUMMARY OF THE ARGUMENT

Appellant next contends that "the combined effect of the errors throughout the trial probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a).

As Appellant has not identified a single legitimate error in trial, this point is moot.

### A. ARGUMENT

While it is conceivable that a number of errors may be found harmful in their cumulative effect, no authority holds that non-errors may in their cumulative effect cause error. See Chamberlain v. State, 998 S.W.2d 230, 238 (Tex.Crim.App.1999) (en banc). However, multiple errors, even if considered

- 37 -

harmless taken separately, may result in reversal and remand for a new trial if the cumulative effect of such errors is harmful. Fibreboard Corp. v. Pool, 813 S.W.2d 658, 695 (Tex.App.—Texarkana 1991, writ denied). Before we may reverse a judgment and order a new trial, we must determine that the error committed by the trial court was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Ibid. at 695–96; TEX. R. APP. P. 44.1(a). Appellants must show that, based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict favorable to it. See Pool, 813 S.W.2d at 695.

Appellant has not shown any errors, but with regard to cumulative error, the appellant falls far short of establishing that the record as a whole support a conclusion that but for any errors, the jury would have rendered a different verdict and, instead, invites this Court and the undersigned to summarize the entire record for him. Appellant has failed to fully present this claim for review by failing to explain how he could have won this trial.

A fair reading of the record establishes that the appellant believed himself, with no experience, investment, knowledge in the industry, or skill, to be an instant "partner" with a successful businessman. Cross-examination of the appellant was, to state it mildly, excruciating due to his evasiveness and parsing of questions-- this was obvious to the jury as it judged his credibility. The appellant did not believe that anything occurred that he did not witness with his own eyes. To use

the example of an insurance company, he did not believe that State Farm exists, that any payments were made to State Farm, or that State Farm was standing behind him despite the fact that he never made a claim. Nearly the entirety of the case was presented to witnesses called by the appellant. The appellant was simply not credible. Mr. Chism had no idea who had deceived him and his affidavit was made under suspicious circumstances. Mr. Stein explained the entire business from top to bottom and the explanation did not comport with the appellant's theory. Mr. Snoddy's testimony was unequivocal: there was no partnership and he owned the assets of the business that he allowed Mr. Anderson to use until Mr. Anderson decided to leave, despite the fact that Mr. Anderson and had several improprieties in the business. He taught Mr. Anderson the business and he helped that business grow. He also watched over the business in his capacity as a buffer between Mr. Anderson and his surety. The Sheriff was satisfied and no bonds were ever refused as a result of the lack of suretyship. There was no evidence the surety was not paid but, to the contrary, Mr. Stein testified that his income was derived from those payments so they must of been made. Appellant's counsel, as an extension of the appellant, was confused about how the business worked, matters such as the proper name "Surety Company," and the hierarchy of the people who make the business possible. It is fair to assume that repeated, outraged, expressions of disbelief of things that the appellant and his counsel could

not see and touch were, after a time, accepted by the jury as a general lack of knowledge. Appellant's counsel has addressed a few of the <u>dozens</u> of sustained objections during the trial. In these circumstances it would be difficult for any reviewing court to determine that the results would have been different but for cumulative error, or that any error at all has been identified by the appellant.

## XIV. PRAYER

For the reasons stated above, Appellant's appeal should be dismissed.

Respectfully submitted,

L. Charles van Cleef
State Bar No. 00786305

P.O. Box 2432
Longview, Texas 75606-2432
(903) 248-8244 Telephone
(903) 248-8249 Facsimile

COUNSEL FOR APPELLEE

## XV. CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded by facsimile, email, and electronic filing to:

Jonathan Wharton
Snow E. Bush, Jr., PC
420 N. Center Street
Longview, TX 75601
Fax: (903) 753-7278
Email: jonathanwharton1@sbcglobal.net

on this Friday, June 26, 2015.

L. Charles van Cleef

## XVI. CERTIFICATE OF COMPLIANCE

In accordance with Rule 9.4(i)(1), Appellee's brief contains 7,984 words as computed by Microsoft Word 2013, in 14 point typeface, Times New Roman.

L. Charles van Cleef

## XVII.    RECORDS EXCEPRTS

None. TEX. R. APP. P. 38.2(A)(1)(C).